# Illinois Official Reports

## Supreme Court

---

### *People v. Gray*, 2017 IL 120958

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. MATTHEW GRAY, Appellee. |
| Docket No. | 120958 |
| Filed | September 21, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (David L. Franklin, Solicitor General, Michael M. Glick and Katherine M. Doersch, Assistant Attorneys General, and Alan J. Spellberg, Michelle Katz, Eric Leafblad, and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and Christofer R. Bendik, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

Benjamin C. Weinberg, of Dentons US LLP, of Chicago, for *amici curiae* LAF *et al.*

Justices          JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1      Following a jury trial in the circuit court of Cook County, defendant, Matthew Gray, was convicted of, *inter alia*, aggravated domestic battery (720 ILCS 5/12-3.3 (West 2010) (as amended by Pub. Act 96-1551, § 5 (eff. July 1, 2011))). The appellate court held that the statutory definition of "family or household members" violated substantive due process as applied to defendant. 2016 IL App (1st) 134012. This court allowed the State's petition for leave to appeal as a matter of right. Ill. S. Ct. R. 317 (eff. July 1, 2006). We now reverse the judgment of the appellate court and remand the cause to that court for further proceedings.

¶ 2      I. BACKGROUND

¶ 3      On November 1, 2011, defendant and the victim, Tina Carthron, spent the evening together drinking. On the morning of November 2, Carthron sustained knife wounds to her chest and back. Defendant was charged by information with two counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a) (West 2010)) and two counts of aggravated battery (720 ILCS 5/12-3.05(a)(5), (f)(1) (West 2010)). Defendant was also charged with three counts of aggravated domestic battery, alleging great bodily harm (720 ILCS 5/12-3.3(a) (West 2010)), permanent disfigurement (*id.*), and strangulation (720 ILCS 5/12-3.3(a-5) (West 2010)). In September 2013, defendant was tried before a jury on all counts.

¶ 4      In the State's case-in-chief, Carthron testified in pertinent part as follows. Carthron was 51 years old. She was born in Chicago and had lived there her entire life. Carthron had known defendant for approximately 20 years. She began to spend time with defendant based on the friendship between their families. Fifteen years ago, they dated for approximately two years. They dated each other exclusively, and they slept over at their respective residences.

¶ 5      In early October 2011, Carthron saw defendant outside of his new apartment. Several times thereafter she visited defendant at his apartment. On one visit, she brought some clothes and left them at defendant's apartment when she went to work. Carthron was not interested in rekindling their romantic relationship, but rather, they remained "just friends."

¶ 6      On November 1, 2011, defendant telephoned Carthron, and she went to his apartment. It consisted of a single room, which included a kitchenette, and a bathroom. Carthron brought whiskey and beer, and she and defendant spent the evening drinking together. Carthron drank approximately a pint of whiskey and 40 ounces of beer. During that evening, defendant's

girlfriend, Laura Moore, telephoned defendant. Carthron became upset, believing that it was disrespectful for defendant to talk to another woman in Carthron's presence. After the call, Carthron and defendant argued, but they eventually listened to music, watched television, and had sex. Defendant went to bed. Carthron continued drinking.

¶ 7     Carthron did not remember whether defendant explicitly invited her to sleep over that night. However, defendant "never had a problem" with her sleeping over, and the reason she went to defendant's apartment was to spend the night.

¶ 8     Carthron testified that she "still was drunk" the next morning. At approximately 7:00 a.m., as she and defendant lay in bed, they argued about the telephone call from Moore. Defendant then climbed on top of Carthron, placed his hands on the front of her neck, and began to strangle her. She passed out. When Carthron regained consciousness, she saw defendant standing in the bathroom holding a knife. Defendant told Carthron to leave because he had called the police. Carthron began to gather her clothes to get dressed. As she grabbed her coat, Carthron saw that the left side of her chest was bleeding and said "oh no, you didn't stab me." According to Carthron, defendant said in response: "Get out." Carthron testified: "He just kept saying get out. He had called the police on me." On cross-examination, Carthron testified that she did not remember defendant stabbing her. She also acknowledged that she was "kind of drunk" that morning and did not remember biting defendant.

¶ 9     Carthron left defendant's apartment dressed in only her jeans and a leather jacket, leaving behind her cell phone, eyeglasses, and underwear. Carthron saw police officers outside of defendant's apartment building. However, she did not approach them because she did not know what defendant had told them.

¶ 10    Carthron had two daughters, Marie and Suzette. Although Carthron was living with Marie, Carthron went to Suzette's home because Carthron knew that Suzette would be at home. Carthron rode two city buses for about 30 minutes to reach Suzette's home. She climbed the stairs to Suzette's third-floor apartment slowly because she was in pain. Once inside, Carthron sat on a chair and told Suzette that defendant had stabbed her. As Suzette was removing Carthron's jacket, Carthron noticed that her back hurt also. Once the jacket was off, they discovered that Carthron had also been stabbed in the back. Suzette called 911, and Carthron was taken by ambulance to a hospital for treatment.

¶ 11    Carthron spoke with Chicago police personnel while she was at the hospital, and after she was discharged, she went to the police station and was interviewed a second time. Officers then drove her home, stopping along the way at defendant's apartment, where they retrieved Carthron's eyeglasses.

¶ 12    The State's case-in-chief included DNA evidence, which established the presence of Carthron's blood on a knife recovered from defendant's apartment. In addition, the State presented other-crimes evidence pertaining to two prior incidents between defendant and Laura Moore. In September 2010, police responded to a domestic battery call by Moore. She reported that defendant kicked her down a flight of stairs and hit her in the eye. They were both very intoxicated. Moore was hospitalized for a left ankle fracture and a facial contusion. However, she did not want to sign a criminal complaint. In February 2011, police responded to another domestic battery call, where both Moore and defendant appeared to be intoxicated. Moore told police that she and defendant were watching the Super Bowl when defendant became angry and began choking Moore. She declined to have an ambulance called.

¶ 13        Defendant's theory of the case, as indicated by his trial counsel's opening statement and closing argument, was that defendant did not intend, and never attempted, to kill Carthron. Rather, defendant wounded her in self-defense.

¶ 14        As his first witness, defendant called Detective Rapunzel Williams, who interviewed Carthron at the hospital on November 2, 2011. Carthron told Williams that she had been sleeping at defendant's apartment the previous night and awoke in the early morning hours. Williams believed Carthron indicated the time was approximately 1:30 a.m. As Carthron prepared to leave the apartment, she saw that she was bleeding from her left side and that defendant was holding a knife. Carthron did not initially state that she was awakened because defendant was choking her or that he had choked her until she passed out. However, Williams again interviewed Carthron at the police station later that day. During the second interview, Carthron stated that she had been choked by defendant. In addition, Williams observed defendant that day and saw that he had an oval-shaped red mark below his chest.

¶ 15        Testifying on his own behalf, defendant stated in relevant part as follows. He and Carthron had known each other for approximately 20 years, and they had a prior romantic relationship that ended approximately 15 years earlier. Though they no longer dated, he and Carthron had remained friends and occasionally saw each other in the neighborhood. During the first week of October 2011, defendant was outside his new apartment building and saw Carthron as she walked by. Later that month, defendant agreed to keep a bag of clothing for Carthron, and she brought him some wine when she returned to collect the bag later that night.

¶ 16        On the afternoon of November 1, 2011, defendant went to the store and purchased whiskey, cigarettes, and juice for Carthron, as she had requested. Defendant also bought himself some wine. At about 7 p.m., defendant called Carthron and told her how much she owed him for the items he purchased for her. During that conversation, he invited Carthron to come to his apartment because she sounded depressed. When she arrived, Carthron asked if she could have a cocktail before leaving. Defendant agreed, and he and Carthron began drinking while they were listening to music and talking.

¶ 17        At about 11 p.m., defendant received a telephone call from Moore, whom he had dated for 15 years and considered to be his common-law wife. Defendant turned the music off and spoke to Moore, telling her that he would go see her after he took a short nap. He gave Carthron the remote control for the television and told her that he would walk her home after his nap. When defendant went to sleep, Carthron was fully dressed, sitting in a chair, and having a drink. He and Carthron did not argue that night, and they did not have sexual relations.

¶ 18        Defendant awoke at about 7 a.m. because Carthron was biting his lower chest. Carthron, who was 5 feet, 4 inches tall and weighed about 125 pounds, had him pinned to the bed with her arm around his waist and her leg on top of him. When defendant tried to push her head away, she bit him harder. He yelled and told her to let him go, but she bit him harder still. Though defendant, who was 6 feet tall and weighed about 165 pounds, put his hands on Carthron's shoulder in an attempt to push her off, she would not let go. Defendant did not put his hands around Carthron's neck, but he may have scratched her neck with his long fingernails. In addition, defendant believed that the photograph of marks on Carthron's neck on November 2, 2011, depicted "old wounds."

¶ 19        After repeatedly telling Carthron to let go, defendant tried to find something he could use to hit her. The lights were out, and the room was illuminated solely by the television. The only

item defendant could reach was a knife that he kept near his bed for security. Defendant touched Carthron's back once with the knife but she continued biting him. When he touched her back with the knife a second time, he cut her, and she released her bite. Defendant then pushed Carthron off the bed. It was possible that the knife touched Carthron's chest when he pushed her off of him, but he did not know at that time that her chest was bleeding. Although defendant touched Carthron's back with the knife, he did not intend to stab or hurt her.

¶ 20 When Carthron fell to the floor, defendant got up and turned on the light. He then went to the bathroom and saw that he had a bite mark on his lower chest. He used a wet face towel to put some witch hazel on the wound, which was not bleeding. He then returned to the bedroom where Carthron was sitting in her underwear and drinking whiskey. Defendant told Carthron that he had cut her, and he used the towel to dab her back with the witch hazel, but he did not bandage her wound. Carthron stood up but refused to speak to him. After finding her clothes, defendant told Carthron to leave before he called the police on her. Defendant then went back into the bathroom for a moment and, when he came out, he saw Carthron dressed and standing by the door. He escorted her out of the building and then called 911.

¶ 21 Defendant also testified, however, that an ambulance was already outside when Carthron left the building but she declined to get in it. Defendant did not remember telling a 911 operator that his girlfriend had attacked him with a knife, that she bit him, or that he stabbed her. In addition, he did not remember telling the 911 operator that Carthron may have been hurt badly.

¶ 22 Defendant acknowledged that, when he spoke to Detective Williams and Detective Steven Scott at the police station on the day of the altercation, he told them that the ambulance had taken Carthron to the hospital. However, defendant denied telling the detectives that he and Carthron argued about the telephone call from Moore and that he had put a bandage on Carthron's back.

¶ 23 Upon being questioned about prior incidents involving Moore, defendant acknowledged she had called the police on two occasions. Defendant stated that he and Moore were drinking in the afternoon of September 2, 2010, when Moore slipped on the stairs. According to defendant, the police happened to be passing by and asked what had happened. Moore, who was drunk, said that defendant had pushed her down the stairs. At trial, defendant denied punching Moore in the face or kicking her down the stairs. Defendant also testified that Moore called the police on another occasion when he pushed her during an argument. Defendant acknowledged that he and Moore were both intoxicated at the time of the argument.

¶ 24 As part of the State's case in rebuttal, Chicago 911 operator Mark Coit testified as follows. On the morning of November 2, 2011, Coit received an emergency call from a person who identified himself as defendant. The caller stated that his girlfriend attacked him with a knife, that he took the knife and stabbed her, and that "she may be hurt bad."

¶ 25 Detective Scott testified that he and Detective Williams spoke to defendant at the police station on November 2, 2011. During that conversation, defendant stated that he had a verbal altercation with Carthron about his girlfriend and that, after the altercation became physical, he put a "patch" on Carthron's back.

¶ 26 At the close of the evidence, the jury found defendant guilty of two counts of aggravated domestic battery and one count of aggravated battery, based on his strangling and stabbing of Carthron. The circuit court denied defendant's motion for a new trial and proceeded to sentencing. At the close of the sentencing hearing, the court sentenced defendant to concurrent

five-year prison terms on the aggravated domestic battery convictions and a concurrent three-year prison term on the aggravated battery conviction.

¶ 27 On appeal, defendant challenged the sufficiency of the evidence against him and claimed that section 112A-3(3) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/112A-3(3) (West 2010)), which defined family or household members,[1] is unconstitutional as applied to him and his relationship to Carthron. The appellate court held that, because the relationship between defendant and Carthron was no longer under the effect of the prior romantic intimacy that had existed 15 years earlier, the definition of household or family member is unconstitutional as applied to defendant. 2016 IL App (1st) 134012, ¶¶ 31, 46-47. The appellate court also determined that the admission of other-crimes evidence relating to defendant's acts of domestic battery against Moore warranted a new trial on the charge of aggravated battery. *Id.* ¶¶ 48-49.

¶ 28 Lastly, so as not to subject defendant to double jeopardy, the appellate court found that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. *Id.* ¶¶ 51-53. Accordingly, the appellate court vacated defendant's convictions for aggravated domestic battery and remanded the cause to the trial court for a new trial on his aggravated battery conviction. *Id.* ¶¶ 48, 55-56.

¶ 29 The State appeals. We granted LAF (formerly the Legal Assistance Foundation) *et al.* leave to submit an *amici curiae* brief in support of the State. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 30                                II. ANALYSIS

¶ 31 The State assigns error to the appellate court's holding that the domestic battery statute's definition of family or household members violates substantive due process as applied to defendant. Seeking cross-relief, defendant assigns error to the appellate court's holding that the evidence was sufficient to sustain his convictions. We address defendant's contention first. See, *e.g.*, *People v. Sledge*, 25 Ill. 2d 403, 404 (1962) (addressing sufficiency of evidence prior to addressing constitutional claims).

¶ 32                        A. Sufficiency of the Evidence

¶ 33 Defendant was convicted of two counts of aggravated domestic battery (720 ILCS 5/12-3.3(a), (a-5) (West 2010)), which alleged that he caused great bodily harm to Carthron, who was a family or household member, by stabbing her (count III) and that he strangled her (count V). Defendant was also convicted of one count of aggravated battery (720 ILCS

---

[1]Before this court, the parties agree that they and the appellate court cited the wrong statutory provision for the definition of family or household members for the crime of domestic battery. Prior to July 1, 2011, section 112A-3(3) of the Code of Criminal Procedure, which pertains to orders of protection, provided the definition of "family or household member" as that term appeared in the domestic battery statute. 720 ILCS 5/12-3.2(a)(1) (West 2010). However, effective July 1, 2011, Public Act 96-1551 amended the Criminal Code of 1961 (Criminal Code) to add a new section 12-0.1, which defines family or household members for purposes of article 12 of the Criminal Code. Pub. Act 96-1551, § 5 (eff. July 1, 2011) (adding 720 ILCS 5/12-0.1). The definitions are the same. Although the parties continue to refer to section 112A-3(3) of the Code of Criminal Procedure, we will hereinafter refer to section 12-0.1 of the Criminal Code.

5/12-3.05(f)(1) (West 2010)), which alleged that he caused bodily harm to Carthron through the use of a deadly weapon by stabbing her with a knife (count VIII).

¶ 34    On cross-appeal, defendant claims that the State failed to prove him guilty beyond a reasonable doubt because Carthron's testimony was not credible and her version of events was improbable. Specifically, defendant claims that Carthron's intoxication at the time of the altercation renders her testimony "utterly implausible." Defendant contends that Carthron's "level of intoxication alone eviscerates [her] credibility" and that this court "cannot trust anything she has said about the events" that transpired in defendant's apartment on the morning of November 2, 2011. He also argues that the State failed to prove that he was not acting in self-defense when he cut Carthron with a knife.

¶ 35    The State has the burden of proving beyond a reasonable doubt each element of an offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When a defendant challenges the sufficiency of the evidence, a court of review must determine "whether, [after] viewing the evidence in the light most favorable to the State, ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (2015), quoting *Jackson*, 443 U.S. at 319). It is not the role of the reviewing court to retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *People v. Bradford*, 2016 IL 118674, ¶ 12. Therefore, a court of review will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Belknap*, 2014 IL 117094, ¶ 67. Although a fact-finder's determination of witness credibility is entitled to great deference, it is not conclusive and does not bind the reviewing court. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 36    The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant. *Siguenza-Brito*, 235 Ill. 2d at 228. Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 279. Under this standard, the eyewitness testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* at 280. A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 37    Here, it is undisputed that defendant and Carthron were the only two people in the apartment on November 1 and 2, 2011, and that, based on her prior dating relationship with defendant, Carthron was a family or household member. See 720 ILCS 5/12-0.1 (West 2010). Carthron testified at trial that at about 7 a.m. on November 2, she and defendant argued about the telephone call he had received from Moore the previous night. During that argument, defendant put his hands around her neck and choked her until she passed out. When she regained consciousness, she saw defendant holding a knife and also saw that she was bleeding from a stab wound on her chest. Carthron further testified that, when she arrived at her

daughter's apartment, she discovered that she also had a stab wound on her back. Carthron's trial testimony as to these essential facts was clear and positive. If believed by the jury, Carthron's testimony was sufficient to prove that defendant had strangled her and caused her great bodily harm by stabbing her with a knife. Accordingly, this evidence was sufficient to prove him guilty of two counts of aggravated domestic battery and one count of aggravated battery beyond a reasonable doubt.

¶ 38    Defendant asserts, however, that the State failed to carry its burden of proof because none of Carthron's testimony can be believed. In support, he points to the fact that Carthron was intoxicated at the time of the altercation, having consumed a pint of whiskey and 40 ounces of beer during the previous 12 hours. According to defendant, "[Carthron's] level of intoxication alone renders her entire version of the events incredible." In defendant's view, nothing about Carthron's description of what occurred in his apartment on November 1 and 2, 2011, can be believed. This assertion is without merit.

¶ 39    Initially, we reject defendant's claim that *all* of Carthron's testimony is entirely incredible for the simple and obvious reason that several aspects of her testimony are corroborated by defendant's own version of events. Defendant and Carthron both testified that she came over at about 7 p.m. on November 1, they consumed alcoholic beverages and listened to music together until about 11 p.m., when defendant received a telephone call from Moore, the physical altercation occurred at about 7 a.m. on November 2, and Carthron had a stab wound on her back when she left defendant's apartment. Also, defendant admitted that he cut Carthron's back with a knife but claimed he did so in self-defense, and he acknowledged that he may have cut her chest with the knife as he was pushing her onto the floor. Given that defendant corroborated these facts, we consider whether the remaining portions of Carthron's testimony are unworthy of belief and must be disregarded because she was intoxicated.

¶ 40    Evidence that a witness was drinking near the time of an event about which she testifies is probative of the witness's sensory capacity (*People v. Di Maso*, 100 Ill. App. 3d 338, 343 (1981)) and affects the weight to be given her testimony (*People v. McGuire*, 18 Ill. 2d 257, 259 (1960)). However, the fact that a witness had been drinking alcohol or was drunk does not necessarily preclude the trier of fact from finding the witness credible. *People v. Bradford*, 194 Ill. App. 3d 1043, 1046-47 (1990); *People v. Vandiver*, 127 Ill. App. 3d 63, 67 (1984).

¶ 41    Here, the jury was well aware of the amount of alcohol Carthron had consumed at defendant's apartment and that she was still drunk at 7 a.m. The assessment of Carthron's credibility was properly a question for the jury, which had the opportunity to view her testimony first hand at trial.

¶ 42    Contrary to defendant's argument, this court's decision in *People v. Pellegrino*, 30 Ill. 2d 331 (1964), does not mandate that the jury's determination of Carthron's credibility be overturned. In *Pellegrino*, the evidence indicated that the defendant and two other men were present during the beating of the deceased. *Id.* at 332-34. One eyewitness identified both of the two other men, in turn, before finally naming defendant as the person responsible for the fatal beating, and she did so only after being informed that she was to be charged as an accessory to the murder. *Id.* at 332-33. A second eyewitness also identified defendant as the person who beat the deceased. *Id.* at 333. However, she further admitted that on the night of the murder she was in the fourth week of a seven-week period of drunkenness and that, although she had not consumed alcohol that night, her prior drunkenness had affected her ability to walk a distance

of five feet and her ability to recognize a person who was standing three feet away. *Id.* at 333-34. This court found that the evidence of the defendant's participation in the fatal beating of the deceased was so unsatisfactory as to require reversal of his conviction. *Id.* at 334-35.

¶ 43 In this case, it is undisputed that defendant and Carthron were the only two people present in the apartment, and defendant admitted that he cut Carthron's back with the knife and that he may have cut her chest while pushing her to the floor. Given that *Pellegrino* involved a question of identification and was premised on facts that are vastly different from those presented here, it does not require that defendant's conviction be reversed.

¶ 44 In asserting that Carthron's version of events cannot be credited, defendant claims that her intoxication caused her not to remember being stabbed by defendant or whether she had bitten him on the chest. However, neither of these memory lapses mandates that Carthron's testimony be wholly disregarded. Carthron testified that defendant choked her until she passed out and that she discovered the knife wound on her chest after she regained consciousness and discovered the wound on her back later at her daughter's apartment. This evidence would support a reasonable inference that defendant stabbed Carthron while she was unconscious, causing her to have no memory of the stabbing. Also, Carthron acknowledged that she was "kind of drunk" and did not remember biting defendant or what was said on November 2. The jury found Carthron's testimony credible even though she acknowledged that she did not recall certain portions of what transpired that morning.

¶ 45 Defendant further asserts that Carthron did not remember whether defendant choked her or whether they had an argument that morning. However, these assertions are not supported by the record. Carthron testified clearly and positively that defendant put his hands around her neck and choked her until she passed out, and she reported the choking to Detective Williams on the same day that it occurred. The fact that Carthron conveyed that information to Williams during their second interview at the police station, and not during the first interview at the hospital, does not support the contention that she did not recall being choked by defendant. Carthron's trial testimony that she and defendant argued about Moore's telephone call was similarly clear and positive. Moreover, Carthron's version of events was supported by the photographic evidence showing scratches and nail marks on her neck and by Detective Scott, who interviewed defendant on November 2, 2011. During that interview, defendant stated he had a verbal altercation with Carthron about his girlfriend and that the verbal altercation then became physical.

¶ 46 Defendant also points to the fact that certain portions of Carthron's testimony were inconsistent with her prior statements. In particular, defendant asserts that Carthron's recollection of the timing of the altercation was confused because she told Williams that she woke up at 1:30 a.m. and was bleeding from her side and saw defendant with a knife. Yet Williams's testimony in this regard was tentative, and she qualified her account of Carthron's statement with the phrase "I believe it was." Defendant further relies on the fact that Carthron testified during a preliminary hearing that she did not know whether she and defendant had argued before "the incident." Given that Carthron and defendant were together for approximately 12 hours and that the reference to "the incident" was never specifically defined at trial, Carthron's prior testimony at the preliminary hearing was not directly inconsistent with her trial testimony.

¶ 47        Moreover, even contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully. *Cunningham*, 212 Ill. 2d at 283 (citing *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974)). Thus, the fact-finder is charged with deciding "how flaws in part of the testimony affect the credibility of the whole." *Id.* Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief. *People v. Burgos*, 243 Ill. App. 3d 993, 1001 (1993). In addition, where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable. *Id.* at 1001-02. Here, there is nothing in the record indicating that the alleged inconsistencies cited by defendant render the whole of Carthron's testimony unworthy of belief. See *Cunningham*, 212 Ill. 2d at 284.

¶ 48        We similarly reject defendant's claim that Carthron's actions immediately after the altercation rendered her entire story "utterly implausible." Defendant argues that Carthron's conduct in walking past police officers without requesting help and traveling 30 minutes on two buses to reach her daughter's apartment was "contrary to the laws of nature or universal human experience." See *People v. Coulson*, 13 Ill. 2d 290, 297 (1958). Yet Carthron's reasons for taking these actions were fully explored at trial. Carthron explained that she did not request help from the police because she knew they had been called by defendant and she did not know what story he had told them. She further explained that she was thinking only about getting to her daughter's house so she could get help and that she was not aware of the full extent of her injuries. In light of this evidence, Carthron's conduct after the altercation does not undermine her credibility or render her version of events incredible on its face. Consequently, the jury reasonably could have accepted Carthron's explanation, and the record does not compel the conclusion that her testimony is entirely unworthy of belief.

¶ 49        Finally, defendant argues that the State failed to prove that he was not acting in self-defense when he stabbed Carthron with a knife. We disagree.

¶ 50        Self-defense is an affirmative defense, and once it is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). Self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. 720 ILCS 5/7-1 (West 2010); accord *Lee*, 213 Ill. 2d at 225 (enumerating elements). If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails. *Lee*, 213 Ill. 2d at 225.

¶ 51        In deciding a claim of self-defense, it is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Id.* It is also incumbent on the jury to resolve conflicts or inconsistencies in the evidence. *Id.* The standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.*

¶ 52        Defendant admitted that he cut Carthron's back with a knife, but he claimed that he did so in self-defense because she was biting him. Defendant claims that, because he was not

- 10 -

obligated to measure the precise amount of force he used to protect himself from Carthron, the State failed to prove beyond a reasonable doubt that he was not acting in self-defense. This argument is unavailing where defendant admitted that Carthron's bite never broke the skin and that she never attacked him with a knife. Based on these admissions and the undisputed evidence that defendant was 6 feet tall and weighed about 165 pounds, while Carthron was 5 feet, 4 inches tall and weighed about 125 pounds, the jury reasonably could have drawn the inference that the force used by defendant was not necessary. Accordingly, the jury could have found beyond a reasonable doubt that defendant was not acting in self-defense when he stabbed Carthron with a knife.

¶ 53    Viewing all of the evidence in the light most favorable to the prosecution, coupled with the reasonable inferences that may be drawn therefrom, we conclude that a rational trier of fact could have found defendant's guilt beyond a reasonable doubt. For the foregoing reasons, we hold that the State presented sufficient evidence to prove defendant guilty of two counts of aggravated domestic battery and one count of aggravated battery beyond a reasonable doubt.

¶ 54                    B. As-Applied Substantive Due Process

¶ 55    The appellate court agreed with defendant that the definition of family or household members provided by section 12-0.1 of the Criminal Code violated substantive due process as applied to him. Before this court, the State contends that the application of this statutory definition to defendant's circumstances constituted a reasonable exercise of the State's police power.

¶ 56    We initially observe that the appellate court did not indicate whether its holding was based on the state due process clause, the federal due process clause, or both. Before this court, the State makes the same omission in its argument. Although defendant cites both the federal and state due process clauses, he does not argue that the state due process clause provides greater protection than that provided by the federal constitution. Absent any argument to the contrary, we find no compelling reason to construe the state due process clause independently of its federal counterpart with regard to defendant's substantive due process claim. See *In re M.A.*, 2015 IL 118049, ¶ 53.

¶ 57    Our review of this issue is guided by familiar principles. Statutes are presumed constitutional, and the party challenging the constitutionality of a statute has the burden of clearly establishing its invalidity. A court must construe a statute so as to uphold its constitutionality if reasonably possible. The constitutionality of a statute is a question of law subject to *de novo* review. *Id.* ¶ 21; *People v. Jones*, 223 Ill. 2d 569, 595-96 (2006).

¶ 58    We further observe that defendant did not challenge the facial constitutionality of the statutory definition of family or household members but rather only as that definition was *applied* to his case. A statute is facially invalid only if there is no set of circumstances under which the statute would be valid. In contrast, an "as-applied" challenge protests against how a statute was applied in the particular context in which the challenging party acted or proposed to act. Accordingly, in an as-applied challenge, the challenging party's particular facts and circumstances become relevant. *M.A.*, 2015 IL 118049, ¶¶ 39-40; *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008). "An as-applied challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36; see *Hegwood v. City of Eau Claire*, 676

F.3d 600, 603 (7th Cir. 2012) ("When we are confronted with an as-applied challenge, we examine the facts of the case before us exclusively, and not any set of hypothetical facts under which the statute might be unconstitutional."). While a successful facial attack voids the statute in its entirety and in all applications, a successful as-applied challenge enjoins enforcement of the statute only against the challenging party. *M.A.*, 2015 IL 118049, ¶¶ 39-40; *Napleton*, 229 Ill. 2d at 305-06.

¶ 59 Pursuant to the State's police power, the legislature has broad discretion to define offenses and prescribe aggravating factors and penalties for offenses. *People v. Coleman*, 111 Ill. 2d 87, 96 (1986); accord *People v. Taylor*, 102 Ill. 2d 201, 205 (1984) ("The legislature has the power to declare and define conduct constituting a crime and to determine the nature and extent of punishment for it."). However, this legislative discretion is limited by the constitutional guarantee of substantive due process, which provides that a person may not be deprived of liberty without due process of law. *People v. Madrigal*, 241 Ill. 2d 463, 466 (2011); *People v. Reed*, 148 Ill. 2d 1, 11 (1992).

¶ 60 In the case at bar, defendant does not claim that the statutory definition of a family or household member deprives him of a fundamental constitutional right. When a challenged statute does not affect a fundamental constitutional right, the appropriate test for determining its constitutionality is the rational basis test. A statute will be upheld under the rational basis test if the statute bears a reasonable relationship to the public interest to be served and the means adopted are a reasonable method of achieving the desired objective. *Madrigal*, 241 Ill. 2d at 466; *People v. Williams*, 235 Ill. 2d 178, 205 (2009). In other words, a statute will be upheld if it bears a rational relationship to a legitimate legislative purpose and is neither arbitrary nor discriminatory. *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 122 (2004).

¶ 61 While not "toothless," the rational basis test is highly deferential. *Jones*, 223 Ill. 2d at 596. A court is not concerned with the wisdom of the statute or with whether it is the best means to achieve the legislature's desired result. *Village of Lake Villa*, 211 Ill. 2d at 125-26. "The judgments made by the legislature in crafting a statute are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Arangold Corp. v. Zehnder*, 204 Ill. 2d 142, 147 (2003). If there is any conceivable basis for determining that the statute is rationally related to a legitimate state interest, the law must be upheld. *Village of Lake Villa*, 211 Ill. 2d at 126; *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 124 (1998).

¶ 62 In applying the rational basis test, a court must first ascertain the purpose of the statute to determine whether the statute's provisions reasonably implement that purpose. *M.A.*, 2015 IL 118049, ¶ 55. In the case at bar, the appellate court observed that "the State has an interest in preventing abuse between persons who share an intimate relationship." 2016 IL App (1st) 134012, ¶ 47. This observation has generated argument before this court as to the scope of the statutory purpose. However, the legislative purpose is manifest. "The legislature's obvious concern in enacting the domestic battery statute was in curbing the serious problem of domestic violence." *People v. Wilson*, 214 Ill. 2d 394, 402-03 (2005). Also, the parties agree, as the defendant in *Wilson* conceded, that "the threat of domestic violence does not end when a relationship ends." *Id.* at 403.

¶ 63 We must next determine whether the domestic battery statute bears a rational relationship to the public interest in curbing domestic violence. As noted earlier, the statutory scheme under

which defendant was charged was amended effective July 1, 2011. Pub. Act 96-1551, § 5 (eff. July 1, 2011). Defendant was charged with aggravated domestic battery, which requires the commission of the predicate offense of domestic battery. 720 ILCS 5/12-3.3(a), (a-5) (West 2010). In turn, a person commits domestic battery if he or she knowingly, without legal justification, and by any means causes bodily harm to, or makes insulting or provoking physical contact with, "any family or household member." 720 ILCS 5/12-3.2(a)(1) (West 2010). Further, section 12-0.1 of the Criminal Code provides, in relevant part, the following definition: " 'Family or household members' include *** persons who have or *have had* a dating or engagement relationship. *** For purposes of this Article, neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." (Emphasis added). 720 ILCS 5/12-0.1 (West 2010). By its plain language, "[t]he statute is very clear that there is no time limit." *Wilson*, 214 Ill. 2d at 402.

¶ 64    Unable to identify "any objective that would be furthered by treating Carthron as defendant's family or household member," the appellate court concluded that treating Carthron as defendant's family or household member was not reasonably related to a public interest. 2016 IL App (1st) 134012, ¶ 47. We disagree with this conclusion. Rather, we agree with the State and supporting *amici* that the absence of a time limit on former dating relationships, as applied to the instant case, was reasonable and rationally related to the statutory purpose of curbing domestic violence.

¶ 65    The legislature could rationally have believed that persons who have had a dating relationship are more likely to batter a former partner even after their dating relationship ends. The absence of a time limit on former dating relationships recognizes that such relationships may render persons more vulnerable to abuse by former romantic partners. Indeed, not only is this rational basis conceivable, it is generally recognized. See Jennifer L. Hardesty & Grace H. Chung, *Intimate Partner Violence, Parental Divorce, and Child Custody: Directions for Intervention and Future Research*, 55 Fam. Rel. 200, 201 (2006) (stating that violence often continues and sometimes escalates after women leave abusive partners and that separation is linked with a woman's risk of being killed by an intimate partner); Ruth E. Fleury, Cris M. Sullivan, & Deborah I. Bybee, *When Ending the Relationship Doesn't End the Violence: Women's Experiences of Violence by Former Partners*, 6 Violence Against Women 1363, 1364 (2000) (same). As one scholar has explained:

> "One reason violence in a relationship differs from random violence between strangers is that the perpetrator takes advantage of the relationship to gain access to the victim. Relationships built on close personal interactions inevitably involve parties gaining information about each other. *** Such knowledge enables the accessibility that makes domestic violence most harmful, as it increases the victim's exposure and vulnerability to the abuser. Therefore, accessibility and familiarity between abuser and victim can make violence between the two particularly problematic. *** Also, when the relationship comes to an end, the abuser may still exploit the relationship, continuing to access the victim, carrying on the abusive and controlling behavior." Orly Rachmilovitz, *Bringing Down the Bedroom Walls: Emphasizing Substance Over Form in Personalized Abuse*, 14 William & Mary J. Women & L. 495, 500-01 (2008).

In other words, accessibility and familiarity enable domestic violence to be ongoing and to effectively intimidate and control the victim. *Id.* at 501.

¶ 66 Applying this generally accepted rational basis to the circumstances of the case at bar, it is reasonable to regard defendant and Carthron as family or household members for purposes of the domestic battery statute. Defendant and Carthron had known each other for 20 years, and their families were neighbors. Even though their two-year dating relationship had ended 15 years earlier, they continued to see each other, and their relationship remained close. Carthron left her clothes at defendant's apartment and sometimes spent the night with defendant. The night before the stabbing, defendant and Carthron spent the evening drinking and talking. Indeed, the argument that led to the stabbing began when defendant accepted a telephone call from another woman in Carthron's presence, which she considered to be "disrespectful." That night, defendant and Carthron spent the night together. Further, defendant referred to Carthron as his "girlfriend" to the 911 operator. The record demonstrates a level of accessibility and familiarity between Carthron and defendant such that it is reasonable to place Carthron within the protection of the aggravated domestic battery statute.

¶ 67 We conclude that the legislature's decision not to include a time limit on former dating relationships, when applied to the facts of the instant case, was reasonable and rationally related to the statutory purpose of curbing domestic violence. Accordingly, we hold that the definition of family or household members in section 12-0.1 of the Criminal Code did not violate substantive due process as applied to defendant.[2]

¶ 68 Finally, we observe that the appellate court did not address all of the issues that defendant presented to that court because it considered the substantive due process issue to be dispositive. 2016 IL App (1st) 134012, ¶ 49. Therefore, we remand the cause to the appellate court for consideration of defendant's remaining contentions. See, *e.g.*, *People v. Givens*, 237 Ill. 2d 311, 339 (2010).

¶ 69 III. CONCLUSION

¶ 70 For the foregoing reasons, the judgment of the appellate court is reversed, and the cause is remanded to the appellate court for further proceedings.

¶ 71 Reversed and remanded.

---

[2]In light of our holding, we need not address the State's alternative argument that defendant's aggravated domestic battery convictions should be reduced to aggravated battery. See, *e.g.*, *In re M.M.*, 2016 IL 119932, ¶ 31.