2025 IL App (2d) 240312-U
No. 2-24-0312
Order filed June 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-218 |
| TYLOR HYDE, | ) ) ) | Honorable Julia A. Yetter, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction of aggravated battery to a peace officer based on circumstantial evidence that, when defendant pushed himself back from a wall against which he had been pressed by police officers attempting to restrain him, defendant was aware from the force of his act that it was practically certain to cause great bodily harm to the officer behind him, who, in fact, suffered a pectoral tendon tear.

¶ 2    Defendant, Tylor Hyde, appeals from his conviction, following a bench trial, of aggravated battery to a peace officer (720 ILCS 5/12-3.05(a)(3)(i) (West 2020)). He contends that the State failed to prove him guilty beyond a reasonable doubt, because it failed to prove that he knowingly caused great bodily harm to the peace officer. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      On May 10, 2022, defendant was indicted on three counts of aggravated battery to a peace

officer (*id.* §§ 12-3.05(a)(3)(i), (d)(4)(i) (West 2020)), one count of aggravated battery (*id.* § 12-

3.05(a)(1)), one count of aggravated assault of a peace officer (*id.* § 12-2(b)(4.1)(i)), one count of

felony resisting or obstructing a peace officer causing injury (*id.* § 31-1(a-7)), two counts of

misdemeanor resisting or obstructing a peace officer (*id.* § 31-1(a)), and four counts of domestic

battery (*id.* § 12-3.2(a)(1), (a)(2)). (The State later nol-prossed the domestic battery charges.)

¶ 5      Count I, at issue here, charged aggravated battery to a peace officer and alleged that

defendant, "while committing a battery, *** knowingly caused great bodily harm *** to ***

Sergeant Nathan Herman, in that said defendant pushed his body into Sergeant Herman's body,

knowing Sergeant Herman to be a peace officer performing his official duties."[1]

¶ 6      On February 20, 2024, the matter proceeded to a bench trial at which the following relevant

evidence was presented. Herman testified that, on February 3, 2022, he was a sergeant with the

---

[1]The second and third counts of aggravated battery to a peace officer alleged that defendant

"knowingly made contact of an insulting and provoking nature with" or "knowingly caused bodily harm

to" Herman (counts II and III, respectively) in that defendant "pushed his body into *** Herman's body,

knowing *** Herman to be a peace officer performing his official duties." Count IV charged aggravated

battery (without regard to Herman's status as a peace officer) in that defendant knowingly causing great

bodily harm to Herman. Count V charged aggravated assault in that defendant "knowingly engaged in

conduct which placed *** Herman in reasonable apprehension of receiving a battery, knowing *** Herman

to be a peace officer performing his official duties, in that *** defendant made statements that he had a

concealed weapon before quickly removing his hands from his clothing and swinging an unknown object

toward *** Herman."

West Dundee Police Department. At about 9:40 p.m., he was dispatched to the Extended Stay America hotel in West Dundee to investigate a disturbance. He arrived at the location along with Officer Lauren Rickett, Officer Drew Morgan, and Officer Highland (first name not given). The officers were wearing full police uniforms. They located the source of the disturbance: two individuals arguing and yelling in Room 246. Morgan knocked on the door and announced the police. Defendant opened the door and "appeared to be angry or upset." A female, later identified as Elizabeth Buhmann, was also present. Buhmann had "[s]cratch marks on her face." Buhmann exited the room, and Morgan and Highland walked down the hallway with her while Herman and Rickett remained at the door with defendant.

¶ 7    Herman asked defendant "what's going on" and requested his name. Defendant responded, "T-Nasty." Defendant, who was standing in the doorway, "focused" on Rickett and "started making comments about her." Herman saw defendant "manipulating something" in his "hoodie pocket," so he asked defendant to take his hands out of his pockets for "[s]afety reasons." Defendant responded, "I don't know, it's a concealed weapon." Herman again asked defendant to take his hands out of his pockets. Defendant was "moving something in his hoodie pocket and then he just pull[ed] it out with his right hand and [swung] it towards [Herman's] head." Herman saw a red object in defendant's hand and thought it was a knife. Defendant was standing an "arm's length" away from Herman and came close to striking him. Herman grabbed defendant's right wrist as Rickett grabbed defendant's right hand. Once Rickett had defendant's right hand, Herman switched and grabbed defendant's left hand.

¶ 8    Herman and Rickett attempted to handcuff defendant, but defendant resisted. Counsel inquired, "How was [defendant] resistant?" Herman responded:

"As we go out, this happened in the doorframe. We both have an arm and we move him to the opposite wall *** of the hotel room in the hallway. And we're kind of pushing up against him and he's continuously trying to reach into his hoodie pocket at that point."

Eventually, they were able to pin defendant against the wall opposite the door. Herman was standing "[o]ffset to [defendant's] back-left side." Herman "had [defendant's] left arm with [his] right arm." Herman's right arm was extended almost straight out from his shoulder, and he was leaning to his left side. Defendant's back left shoulder was "in the area between [Herman's] shoulder and [his] elbow on [his] right arm." According to Herman, defendant kept "trying to reach his hand in his hoodie and then he ke[pt] moving around. And as [he was] doing that, he bump[ed] into [Herman]." Defendant's "back-left shoulder area" made contact with the area between Herman's right shoulder and elbow.

¶ 9    Herman further testified:

"Q. *** And does he bump you softly or does by [*sic*] bump you with some force?

A. No. There's force because he's moving around.

Q. Okay. And was it a bump just like he was wiggling back and forth or was it more of a direct action into your arm?

A. It was just he's pulling away trying to get into his hoodie pocket as he's flailing around and hits me with his shoulder."

Later, on redirect examination, Herman testified that defendant "pushed back off the wall *** when [Herman's] arm was up against him."

¶ 10    Herman described what happened when defendant made contact with Herman's arm:

"Q. Okay. And when [*sic*] hits you with his shoulder, what do you feel?

A. Horrible pain.

> Q. Did you feel that pain immediately?
>
> A. Yeah, it was instant.
>
> Q. Where did you feel the pain?
>
> A. My whole (indicating) bicep area, shoulder, chest, just like on fire."

When Herman felt the pain, the officers were still struggling to get defendant's arms behind his back. Defendant kept trying to reach into his hoodie pockets. Herman "end[ed] up trying to get [his] [right] arm up, kind of whipping it up because it wasn't working." Morgan and Highland ran upstairs to assist. The officers were able to pull defendant to the ground. Herman fell on top of and to the side of defendant. Defendant continued to fight and resist, but eventually was handcuffed. Defendant was yelling the entire time. Herman was transported to the emergency room via ambulance and followed up with an orthopedic surgeon the next day. Herman underwent surgery and intensive physical therapy. He returned to full-time duty in September 2022. Herman described the lasting effects of the injury.

¶ 11     Herman testified that he wore a body camera during the incident. He identified People's exhibit No. 1 as the recording taken by his camera. The recording was played for the trial court. The video depicted the incident from the time Herman located defendant's room until Herman entered the ambulance. The video began with Herman and other officers approaching the hotel room door, behind which were sounds of arguing. An officer knocked on the door, and defendant opened it. Defendant acknowledged the officers while continuing to argue with Buhmann. Eventually, Buhmann left the room and went down the hall. After defendant told Herman that he had a "concealed weapon," defendant removed his right hand from his pocket and raised it toward Herman. As he did so, Rickett attempted to restrain defendant, and defendant responded, "I'm just kidding. I'm just kidding." Rickett grabbed defendant's right arm as Herman grabbed his left.

Rickett called for Highland. The view was momentarily obstructed as the officers attempted to restrain defendant. Defendant repeatedly stated, "I was just kidding." When the obstruction cleared, defendant was against (and facing) the hallway wall. Rickett and Herman were to the left and behind defendant. Rickett had her arm on defendant's left shoulder. Using his left arm, Herman attempted to grab defendant's left hand and then his left arm. Herman's right hand was on the back of defendant's right shoulder. The view was obstructed for several seconds. When it cleared, two additional officers were present, and defendant was being restrained on the ground. Buhmann was yelling in the background. Herman stated that "something happened to [his] arm." Defendant and Buhmann continued to yell at each other. Herman radioed that he needed an ambulance and went outside. When the ambulance arrived, Herman entered it and turned off his body camera.

¶ 12    Rickett testified that she was present on February 3, 2022, when the incident occurred. Rickett stayed with Herman while Highland and Morgan walked down the hallway with Buhmann. Rickett described defendant as "a heavier-set, bigger-built male wearing baggie clothes." His demeanor was "belligerent, antagonistic." Rickett testified that when Herman asked defendant to take his hands out of his pocket, defendant stated that "it was a concealed weapon." Rickett could see defendant "ma[ke] a fist motion in his sweatshirt." Defendant pulled his hand out of his pocket, took a step, and lunged toward Herman, making a wide swinging motion with his arm. As Rickett and Herman grabbed defendant's arms, defendant said that "he was just kidding." Rickett and Herman "tried to control [defendant] with [their] hands. So, [they] were grabbing his wrists, his arms in an attempt to put him into handcuffs and put his arms behind his back." Rickett yelled for the other officers to assist, and Highland and Morgan joined them. Eventually, they were able to get defendant up against the wall. As they did so, defendant was "[c]ontinuing to resist." Defendant "would pull his arms away and continuously go towards his waistline. [They] tried to pull his arms.

He pulled them back. It was like—it was just constant fighting of him resisting and trying to get him into handcuffs." They all ended up on the floor, and defendant was eventually handcuffed. Rickett heard Herman say that something was wrong with his arm. Herman left after defendant was secured. It was later determined that defendant had a red vape pen in his hand when he first swung at Herman. Rickett testified further that defendant was uncooperative as the officers placed him in the squad car. He resisted their efforts to secure him in the car and, at one point, "smashed his face on the partition."

¶ 13    Rickett was wearing a body camera during the incident. She identified People's exhibit No. 2 as the recording captured by her body camera. The video was played for the trial court. The video showed Rickett arrive at the building and approach defendant's door, where the three other officers were standing. When Buhmann exited the room, two officers followed her down the hallway. Rickett stayed at the door with Herman. The video showed defendant lunge at Herman and captured the ensuing struggle and efforts to detain defendant. Rickett can be heard calling for Highland. The view from Rickett's camera was obstructed during most of the struggle. The video later showed the officers attempting to place a seatbelt on defendant in the back of the squad car. During this time, defendant yelled obscenities at the officers and resisted their efforts to put the seat belt on.

¶ 14    Morgan testified that he was present during the incident. He described defendant as "[v]ery loud" and "[u]pset" when he opened the hotel room door. When Buhmann exited the room, Morgan and Highland followed her down the hallway to speak with her. When Morgan heard Rickett call for help, he and Highland went back toward the room. Morgan saw Rickett and Herman holding defendant against the wall. Morgan was busy keeping Buhmann away and did not initially help with securing defendant. Morgan saw defendant "pushing back" on Herman and

trying to escape. Morgan next saw everyone fall to the ground. Defendant was not complying with the officers' directions to put his hands behind his back. Defendant kept trying to pull his arms away and put them under his body. Morgan then assisted with getting the handcuffs on defendant. Defendant was "forced" into the handcuffs. Morgan heard Herman say something had happened to his arm and saw him leave the building. A red vaping device was located in the middle of the hall near defendant's room. Morgan identified (1) photographs of the vaping device and (2) the device itself. Morgan testified that defendant "[c]ontinued to be difficult" after being handcuffed. Defendant "kept trying to stand up by like pushing his back up against the wall and walking himself up the wall." Defendant also physically resisted attempts to place him inside the squad car. Morgan described defendant's demeanor as "aggressive."

¶ 15    Morgan was wearing a body camera during the incident. He identified People's exhibit No. 3 as the recording captured by his body camera. It consisted of two parts and was played for the trial court. The first part showed the incident from when Morgan arrived at the hotel room until he walked away with Buhmann. The second part began with Morgan returning to the room after he was called to assist with defendant. When Morgan started toward the room, Herman, Rickett, and Highland were attempting to restrain defendant. Defendant dragged all three officers down the hallway, attempting to free himself, before they were able to place him against the wall and ultimately take him to the ground.

¶ 16    Andrew Wera, an employee of the West Dundee Fire Department, responded to the scene via ambulance and encountered Herman. Herman was "in an excited state and [Wera] could tell that he was in pain." Herman reported having "an issue just moving his arm." Wera examined Herman in the back of the ambulance. Wera observed an "[o]bvious deformity to [the] right

shoulder-humerus area" and could tell that "there was a great amount of pain in that area." Wera transported Herman to the emergency room.

¶ 17 Dr. Cort Lawton, an orthopedic surgeon, testified regarding the extent of Herman's injury. Herman was referred to Lawton for treatment on February 4, 2022. Lawton ultimately diagnosed defendant with a "tear" or "rupture" of the "[p]ectoralis major tendon." Lawton explained that the pectoralis major is "a muscle on the front part of the chest [that] attaches to the humerus or the arm bone and it's important for an adduction or bringing the arm towards the side in an internal rotation." The tendon was "what attaches the muscle to the upper arm." When asked to identify the most common cause of a tear to the pectoralis major tendon, Lawton responded: "They occur from what we call the eccentric load, which essentially means when that muscle is engaged [in] resisting something and something forces it in the opposite direction." Without treatment, such an injury could result in loss of functionality of the arm. On February 15, 2022, Lawton performed surgery to repair Herman's tendon. As a result, Herman had a surgical scar and was in a sling for approximately six weeks. He participated in physical therapy to strengthen his shoulder and regain range of motion. Lawton discharged Herman from treatment on November 9, 2022, at which time Herman had regained full range of motion and had no major ongoing issues.

¶ 18 Following the State's evidence, defendant moved for a directed verdict on the four aggravated battery counts. The trial court denied the motion. Defendant rested without presenting evidence. After hearing closing arguments, the court continued the matter for its ruling.

¶ 19 On March 8, 2024, the trial court issued its ruling. The court found defendant guilty of all counts. As relevant here, the court stated the following as to whether defendant knowingly caused great bodily harm for purposes of count I:

"[A]s it relates to the aggravated battery statute, a person acts knowingly when he is consciously aware that his conduct is practically certain to cause great bodily harm. It is not required that the defendant intend the harmful result, but, rather, that he is aware his intentional act is practically certain to result in that consequence.

In this case, [defendant] was positioned against the wall facing the wall with *** Herman's body up against him when he pushed back off of that wall and into *** Herman forcibly enough to push *** Herman and *** Rickett back off of him. The [c]ourt finds that in taking this intentional action, the defendant did so knowing his conduct was practically certain to result in great bodily harm."

¶ 20    Defendant filed a motion for a new trial, which the trial court denied.

¶ 21    On April 25, 2024, following a sentencing hearing, the trial court sentenced defendant on count I (aggravated battery to a peace officer) to six years in prison, with good-time credit to apply. The court found that counts II (aggravated battery to a peace officer), III (aggravated battery to a peace officer), IV (aggravated battery), VI (felony resisting or obstructing a peace officer causing injury), IX (misdemeanor resisting or obstructing a peace officer), and X (misdemeanor resisting or obstructing a peace officer) merged with count I for sentencing. In addition, the court sentenced defendant on count V (aggravated assault) to two years in prison, with good-time credit to apply. The court found that defendant inflicted "severe bodily injury" on Herman and that, thus, consecutive sentences were mandated. See 730 ILCS 5/5-8-4(d)(1) (West 2022).

¶ 22    The trial court denied defendant's subsequent motion to reconsider his sentence. This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    Defendant contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery (720 ILCS 5/12-3.05(a)(3) (West 2022)), because it failed to prove that he acted with knowledge in causing great bodily harm to Herman. We disagree.

¶ 25    In reviewing a challenge to the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A guilty verdict may be supported by not only the evidence itself, but also any reasonable inference that may be drawn from the evidence." *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 33. It is not this court's role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Therefore, we will not substitute our judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Id.* A defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 26    As charged here, a defendant commits aggravated battery when, in committing a battery, he knowingly "[c]auses great bodily harm *** to an individual whom the person knows to be a peace officer *** performing his or her official duties." 720 ILCS 5/12-3.05(a)(3)(i) (West 2022). A defendant acts "knowingly" regarding the result of his conduct when he "is consciously aware that that result is practically certain to be caused by his conduct." *Id.* § 4-5(b). Thus, to sustain defendant's conviction of aggravated battery, the State was required to prove, among other things, that defendant was consciously aware that his conduct was practically certain to cause great bodily

harm to Herman. See *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992). "It is not necessary that the State prove that the defendant intended the specific consequence that occurred." *People v. Isunza*, 396 Ill. App. 3d 127, 132 (2009). Because one's mental state is rarely susceptible to direct proof, whether a defendant acted knowingly is generally established through circumstantial evidence and inferred from (1) the defendant's conduct surrounding the act and (2) the act itself. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 44.

¶ 27    Defendant's challenge to the sufficiency of the evidence rests solely on his claim that the State failed to prove beyond a reasonable doubt that he acted with knowledge in causing great bodily harm to Herman. According to defendant, the evidence established that, once Herman and Rickett began trying to restrain defendant by the arms, his goal in moving his shoulder and body around was simply to get his hands in his pockets, not to harm Herman. He claims that "[c]ommon sense dictates that, if someone is trying to get into the pocket of his hoodie while being held by the shoulders against a wall, bodily harm, let alone a tendon rupture, is not 'practically certain' to occur to the person holding the other person to the wall."

¶ 28    Defendant's argument overlooks significant evidence that places his act of contact with Herman in proper context. To be sure, the evidence established that defendant resisted the officers' efforts to place his hands behind his back and handcuff him and that his acts of resistance included attempting to place his hands into the pockets of his hoodie. However, the evidence also established that, while resisting the officers' efforts, defendant forcefully moved his body about. Defendant takes issue with the State's characterization of this bodily movement as " 'forceful thrashing.' " He asserts that the record does not support such a characterization given Herman's testimony that—according to defendant—he "merely bumped or pushed" Herman. Although Herman described the contact as a "bump," he also stated that the bump was with "force." More

importantly, defendant's argument ignores his actions before Herman was injured. As the video evidence demonstrates, even before defendant made contact with Herman's arm, as Herman and Rickett were attempting to handcuff him, his resistance was so strong that Rickett called for assistance from Highland. Then, with three officers attempting to restrain him, defendant was able to move down the hallway, essentially dragging the three officers with him, before finally being pushed against the wall by the officers. It was only then that defendant turned his body and, with "force," pushed his shoulder into the area between the shoulder and elbow of Herman's extended arm.

¶ 29 Here, we must view the evidence in the light most favorable to the State and consider the circumstances surrounding the contact that injured Herman, particularly, the demonstrated force defendant used throughout the incident and his "belligerent, antagonistic" demeanor. Given that perspective, we cannot say that no rational trier of fact could have concluded that defendant used such force against Herman's arm that defendant knew great bodily harm was practically certain to result. The evidence is not so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains. See *People v. Newton*, 2018 IL 122958, ¶ 24. Accordingly, defendant's conviction for aggravated battery to a peace officer is affirmed.

¶ 30                                    III. CONCLUSION

¶ 31 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 32 Affirmed.