NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180664-U

NO. 4-18-0664

FILED
December 22, 2020
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| UNDRA L. INGRAM, | ) | No. 14CF1529 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 2    In April 2018, following a jury trial, defendant, Undra L. Ingram, was found guilty of four counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2008); 720 ILCS 5/11-1.40(a)(1) (West Supp. 2011)), two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West Supp. 2011)), and three counts of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 2008); 720 ILCS 5/11-1.60(c)(1)(i) (West Supp. 2011); 720 ILCS 5/11-1.60(d) (West Supp. 2011)). On appeal, defendant argues his convictions should be reversed because the victim was not a credible witness and the State failed to prove him guilty beyond a reasonable doubt. In the alternative, he argues the State's evidence was insufficient to

convict him on the first count of predatory criminal sexual assault of a child because "the jury had no evidence upon which it could base its verdict and instead could only speculate the alleged conduct took place" within the timeframe alleged by the State. We affirm.

¶ 3                          I. BACKGROUND

¶ 4          On December 9, 2014, the State charged defendant with four counts of predatory criminal sexual assault of a child (counts I, II, III, and IV) (720 ILCS 5/12-14.1(a)(1) (West 2008); 720 ILCS 5/11-1.40(a)(1) (West Supp. 2011)), two counts of criminal sexual assault (counts V and VI) (720 ILCS 5/11-1.20(a)(3) (West Supp. 2011)), and three counts of aggravated criminal sexual abuse (counts VII, VIII, and IX) (720 ILCS 5/12-16(c)(1)(i) (West 2008); 720 ILCS 5/11-1.60(c)(1)(i) (West Supp. 2011); 720 ILCS 5/11-1.60(d) (West Supp. 2011)). Counts I, III, and V alleged defendant "placed his penis in the vagina of D.I." Counts II, IV, and VI alleged defendant "placed his penis in the mouth of D.I." Counts VII, VIII, and IX alleged defendant "placed his hand on the vagina of D.I." Counts I, II, and VII alleged the criminal conduct occurred between October 23, 2009, and June 30, 2011. Counts III, IV, and VIII alleged the criminal conduct occurred between July 1, 2011, and October 22, 2012. Counts V, VI, and IX alleged the criminal conduct occurred between October 23, 2012, and December 3, 2014.

¶ 5          Defendant's case proceeded to a jury trial. In the State's case-in-chief, D.I. testified as follows. She was born on October 23, 1999, and had never skipped a grade or been held back a grade in school. When she was "around six or seven," defendant, D.I.'s biological father, gained custody of D.I., and she moved in with him and his girlfriend, Amanda Fowler, at their home on 23rd Street in Decatur. Amanda's son, Da.F., and Um.I., the daughter of defendant and Amanda, also lived in the home, and later, Amanda gave birth to a son, De.I.

¶ 6          The first time "something happened" between D.I. and defendant, D.I. was "in third

grade." When D.I. would take a bath, defendant would "have [her] come in and sit in front of him so his penis would be touching [her] back," "have [her] wash him," and "have [her] touch his penis." When D.I. would take showers, defendant would "just stand there and watch [her]." After defendant would take a shower, she would "have to put lotion on him."

¶ 7        During the summer of 2010, the family moved to a new home on Wayside Avenue in Decatur. After the move, and once D.I. started fifth grade, "[t]hings started getting physical, like, such as oral came into play," and the contact between defendant and D.I. "changed from [D.I.] touching [defendant], just only touching [defendant], to [defendant] touching [D.I.], to [defendant] telling [D.I.] what to do." D.I. could not recall the date that the first act of oral sex occurred but did recall that "[i]t happened often" thereafter.

¶ 8        Defendant penetrated D.I.'s vagina for the first time after the family moved to Wayside Avenue and when D.I. was "going into sixth grade" at which time she was "about to turn 12." On that occasion, D.I. came to defendant's room where defendant "had placed a towel on the bed." Defendant "told [D.I.] to lay down" and D.I. laid on the bed on her back and was situated so her "lower body was on the towel." Defendant then proceeded to touch D.I.'s breasts and vagina with his hand and then "put his penis in [her] vagina." After defendant finished, D.I. noticed "blood on the towel." Defendant assured D.I. she was "okay" and told her to come with him to the bathroom where she "wiped" herself clean. After this first instance, vaginal intercourse "happened often."

¶ 9        After D.I. had her first period in seventh grade, defendant "start[ed] being more cautious about it" and "would wear condoms more often" but continued having sexual contact with her. On occasion, D.I. was required to "do something for [defendant]" if she "wanted something." For example, D.I. was required to give defendant oral sex in exchange for a snack or

for permission to go to her eighth-grade dance.

¶ 10    All of the sexual interactions between defendant and D.I. occurred when Um.I. and Amanda were outside of the house. D.I. was "never allowed to go" on errands with Um.I. and Amanda. D.I. and Amanda "did not get along at all." Although Da.F. and De.I. were home during some of the sexual interactions, Da.F. "was not usually allowed to come upstairs [(where the other bedrooms were)] unless it was to get food, do his chores," and De.I. was not born yet or very young. Defendant indicated to D.I. their sexual interactions were normal, telling her "this is what all dads do with their daughters." Defendant also told D.I., "[i]f you tell anybody *** you'll get taken away from me. Amanda wouldn't want you. You're not her child," and once De.I. was born, defendant also told her if she told anyone about their sexual interactions, "[De.I.] [would] get taken away." Defendant also prohibited D.I. from having a cell phone, having any contact with her biological mother or her maternal relatives, and "be[ing] anywhere where he wasn't." From the time D.I. was in fourth grade until she was in ninth grade, she was "not allowed to go out of the house other than when [she] was with him" except to go to school. D.I. was allowed outside of the house to go on family vacations and to have friends over to the house, but only "with [defendant's] permission." Defendant and Amanda were also strict disciplinarians. Defendant would "whip [the children] with belts" and Amanda would strike D.I. with a "wooden backscratcher," leaving "welts." D.I. did not tell any of her extended family members about her sexual contacts with defendant because "[n]obody else listened to [her] because [she] was the liar of the family. [She] was made out to be the liar." Specifically, defendant "made [her] out to be a liar" by "tell[ing] [her] aunts things that [she had] never done." Finally, D.I. did not tell anyone about her interactions with defendant because he was her "support system," she "wanted to make [him] proud," and she "didn't want [him] to get in trouble."

¶ 11          Before D.I. started her freshman year of high school, D.I. told Um.I. "some of what was happening." Shortly thereafter, Um.I. and Amanda left to run an errand, and when they returned, Um.I. confessed to D.I. she had informed Amanda what D.I. had told her. Amanda and defendant then "started arguing," and defendant "start[ed] banging" on the door of the room D.I. was in "asking [her], *** [']So I touched you? You telling people that I touched you?['] " Amanda and Um.I. then left again and defendant called D.I. into his room, told her "['][y]ou can't tell people that,' " and promised to stop having sexual contact with her. Defendant did stop for two weeks but then resumed the sexual interactions.

¶ 12          Early on December 3, 2014, defendant walked into D.I.'s bedroom, woke her up, and told her he was going to take Um.I. to school. Although Um.I. had to be at school at the normal time because "she was a tech student," D.I. had a "late start day," meaning "school started later than normal." At this time, defendant had already taken Amanda to work and De.I. to daycare, and Um.I. was taking a shower. Before defendant left D.I.'s bedroom, he told her that, when he returned, he wanted her to "have [her] wrestlers on." D.I. understood from previous sexual interactions with defendant that, when he told her to put on her "wrestlers," he wanted her to put on "a red American flag shirt that had slits on the side" and "stockings, like knee highs." After defendant left to take Um.I. to school, D.I. put on "[t]he pantyhose and shirt," as instructed. When defendant returned, he took D.I. into his bedroom and laid down on the bed. By this time, defendant had "stripped so he was in his boxers." Defendant told D.I. to "come here, come here" and told her "you know you want this footlong," a phrase he had used before, which meant he "want[ed] [D.I.] to give him oral or he *** want[ed] [her] to play with him." Defendant climbed on the bed and asked D.I. to give him oral sex by asking her: "[d]o you want to taste this footlong[?]" D.I. then gave defendant oral sex. Defendant, who was on his back on the bed, then "asked [D.I.] to

- 5 -

get on top." D.I. climbed on top of defendant, and vaginal intercourse followed. After "some time," defendant changed his position, "grabbed a condom, took it out of the package," and put it on. Once defendant "finished," he "went in the bathroom, grabbed *** a white rag, washed hi[m]self off, threw the condom in the toilet, then told [D.I.] to get up and come wipe [herself] off," which she did.

¶ 13        After the sexual assault, D.I. got dressed, put the stockings she was wearing "in the white dresser drawer next to [her] bed," and put on red "penguin panties," which she wore for the next 30 hours. Although she took a shower in the morning on December 4, 2014, she continued to wear the panties because she wanted to "try to make [herself] have an odor so [defendant] wouldn't touch [her]."

¶ 14        On December 4, 2014, D.I. met with her high school counselor and "came out about [her] father sexually assaulting [her]." That same day, the Illinois Department of Children and Family Services removed D.I. from defendant's home, and she was placed in foster care.

¶ 15        On cross-examination, D.I. acknowledged, although she had given multiple interviews about her sexual contacts with defendant, other than December 3, 2014, she had never "pinpointed one other specific date" that sexual contact occurred and had never told anyone "what it took for [her] to get to go to [her] dance" or "to gain access to the snacks." She also stated she could not recall whether she had ever used the term "wrestlers" or "footlong" in any of her prior interviews or statements. D.I. also testified after she reported defendant's conduct, she texted her biological mother and another daughter of her biological mother and informed them she had reported defendant's conduct.

¶ 16        The State next called Junette Kennedy, a registered nurse in Decatur. Kennedy testified, on December 4, 2014, she completed a sexual assault evidence collection kit with D.I.

Before Kennedy began collecting evidence, she asked D.I. to give her a "narrative" so Kennedy would know "which parts of the body [she needed] to pay attention to specifically for evidence." Kennedy recounted that D.I. provided the following narrative:

> "[Defendant] told [D.I.] that while he was gone taking his sister to school that he wanted her to put on a particular pair of socks and a shirt and wait for him in his bedroom. [D.I.] said that she obliged and did that when he came back. When he got back, he—she said that he asked her to perform oral sex on him so she did. Then he began rubbing between her legs with his finger. She didn't know if anything penetrated at that point.
>
> [D.I.] said that [defendant] then undressed himself and placed his penis inside of her without a condom. About halfway through, he pulled out and put a condom on and finished. Afterwards took the condom to the toilet and flushed it down the toilet. She used a white washcloth at that point, wiped herself off and then got into the shower."

After hearing the narrative, Kennedy "swabbed [D.I.'s] mouth since there had been oral contact there," "collected evidence of her underpants," "did a pelvic exam and a pap smear," and collected a blood sample. Kennedy also testified she "noted no physical injury" and D.I. "denied any physical abuse."

¶ 17    Next, the State called Um.I. to testify about an interview she had given to an investigator on December 4, 2014. Um.I. testified that, during the interview, she told the investigator D.I. had informed her that defendant "ma[de] [D.I.] do inappropriate things she [didn't] want to voluntarily do. He [was] forcing her to do it." Um.I. further testified she told investigators D.I. had told her defendant "[f]orc[ed] her to put on those pantihose [*sic*] things, and

he would make her get into shirts that show cleavage or show her breast [*sic*] and sometimes he would want her to actually get naked" and "ma[de] her partake in sexual activity." Um.I. testified she had informed Amanda that D.I. told her "[defendant] put his hands on [D.I.] and he touched [D.I.]" Um.I. further testified she and Amanda would run errands while "[u]sually [D.I.] stayed home" and she and D.I. "both ha[d] pairs of pantihose [*sic*] for, like dresses and stuff."

¶ 18        The State's next witness was Detective James Wrigley of the Decatur Police Department. Detective Wrigley testified that he met with D.I. on December 4, 2014. After the meeting, he executed a search warrant at the family's home on Wayside Avenue. During his search of the house, Detective Wrigley found a white washrag in the laundry room and a red shirt with an American flag on it in D.I.'s bedroom. Detective Wrigley also testified he did not find any condoms in the house.

¶ 19        The State next called Dana Pitchford, a forensic scientist employed by the Illinois State Police. Pitchford testified she examined certain items contained in the sexual assault evidence kit collected by Kennedy and items collected by Detective Wrigley for the presence of semen. According to Pitchford, "no semen was identified" on D.I.'s oral or vaginal swab or on the red panties. Additionally, she testified "no semen was indicated" on the white washcloth collected by Detective Wrigley. However, Pitchford retained the vaginal swabs and panties for further examination. She did not retain the oral swab for further identification because "[t]he swab was collected well over 24 hours" later, and as a result, she "[did] not expect to find anything foreign to the victim in the mouth *** because of eating, drinking, [and] [the] salivary glands breaking [material] down." Pitchford also testified, if seminal fluid were emitted by a man in the form of "[p]re-ejaculate," later "[p]utting on a condom [wouldn't] make all that go away, it [would] still [be] there[.]"

¶ 20    The State's final witness was Kari Broaddus, another forensic scientist at the Illinois State Police Crime Laboratory. Broaddus testified she analyzed D.I.'s vaginal swab and determined "no male DNA was detected," which she stated was "not surprising" because "there was no semen identified." Broaddus next analyzed "six different cuttings" taken from D.I.'s panties. In three of the cuttings, Broaddus found no male DNA or very low levels of male DNA. Although another cutting contained male DNA, defendant was "excluded from that profile." Broaddus determined two of the cuttings contained "a mixture of three males" and defendant "could not be excluded" as a contributor to the mixtures. Broaddus further determined, because no semen was identified in any of the samples of D.I.'s underwear, the DNA found in the mixtures probably contained "skin cells *** or *** cellular material." Broaddus could not say how the male DNA ended up on D.I.'s underwear but noted the transfer could have resulted from "co-mingling of laundry." According to Broaddus, the results of her analysis of D.I.'s panties were "consistent with *** the victim[ ] having gone to the hospital about 36 hours later and the perpetrator having worn a condom" and "the fact that there was no semen identified."

¶ 21    Amanda testified on behalf of defendant. According to Amanda, from approximately 2008 until 2012, defendant was working "at the pipeline" and would work from between 4 and 8 a.m. until 7 or 8 p.m. In 2010, Amanda's employer ceased operations and Amanda stayed at home to raise De.I. for the next two years during which time she was always at home "unless [she] ran to the store or something." By the time Amanda resumed working full-time in 2012, defendant had begun working construction, which required him to work "sporadic" hours. Amanda testified her relationship with D.I. was "good until she maybe got into high school." Before high school, D.I. would "do all the same things that the rest of the family did" and Amanda would spend time with D.I. "every weekend." Eventually, Amanda began to detect "a lot of

animosity in the air" between her and D.I., which she attributed to D.I.'s "mother [not being] active in her life."

¶ 22    During her testimony, Amanda recalled that she and defendant had once discussed that, because the "family [was] older," they needed to "start to knock[ ] on doors" to make sure "everybody [was] dressed before we just enter[ed]." Amanda denied that any "big fight" resulted from her conversation with defendant. Amanda denied that defendant had ever taken a bath with D.I. She also disputed there was "ever any question as to whether or not" D.I. would be permitted to go to her eighth-grade dance or that D.I. had ever been beaten with a belt or a backscratcher. She stated D.I. was never prohibited from communicating with her biological mother. Amanda also denied Da.F. was "banned from coming upstairs and hanging out with the rest of the family" but acknowledged that he was active in sports, "slept a lot," and usually stayed in his room except at mealtimes.

¶ 23    Defendant next called Da.F. According to Da.F., when he was still living at the Wayside Avenue residence, he "was always in sports so [he] was never really at home." Da.F. denied that D.I. did not accompany the entire family when they would go to sporting events, family outings, or to the homes of family members. Da.F. also denied he was "barred from going upstairs in the house and associating with the rest of the family" and that "there [was] any kind of restriction on [D.I. and Um.I.] coming downstairs or [his] coming upstairs."

¶ 24    Defendant also called Jamyra Hayes. Hayes described herself as D.I.'s "best friend." She and D.I. had been classmates since elementary school, and they talked every day. According to Hayes, D.I.'s "reputation for truthfulness" was that "she's a drama queen and she's a liar." Hayes also testified, before D.I. reported defendant's conduct on December 4, 2014, D.I. had "talked to [her] about [it]" and, when D.I. told Hayes, she was "very emotional" and "cried on

[Hayes's] shoulder about it." Hayes later told her mother about D.I.'s allegations.

¶ 25    The defense next called Tonya Oldham, defendant's sister, who testified the "reputation of [D.I.] for truthfulness" was that "she lied. She would lie a lot."

¶ 26    Testifying on his own behalf, defendant stated as follows. When D.I. was young, defendant would "help give [her] baths," but he "never [took] a bath with any of [his] kids." Additionally, D.I. was not required to "do anything to [him] or for [him]" in order to go to her eighth-grade dance. Sometime in 2013 or 2014, Amanda approached defendant and "suggested *** that [D.I.] had made comments" or "said [defendant had] done something." Because defendant was not "give[n] *** any specifics about what [D.I.] was talking about," defendant assumed Amanda and D.I. were referring to a previous incident where defendant walked into D.I.'s bedroom without knocking and saw D.I. with "just [her] undergarments on." Although defendant generally did not use corporal punishment as a disciplinary tool, he had "whipped" all of his children with a belt "a time or two," and the last time he had used a belt on D.I. was when she was 12 years old. Defendant never struck D.I. with a backscratcher.

¶ 27    Defendant woke up on December 3, 2014, and learned he had been called off work that day, so he helped get De.I. ready for daycare, took Amanda to work, and took De.I. to daycare. After he dropped De.I. off, he "stopped at the gas station, *** got *** a newspaper, went back to the house, *** went in the front door, [and] sat on the side of [his] bed." As he was reading the newspaper, Um.I. was taking a shower and getting ready for school. D.I. then came into his bedroom and told him good morning. At that time, D.I. was wearing "the flag shirt" as well as "another shirt and *** her garments." Defendant then drove Um.I. to catch her bus. When defendant returned home, D.I. was still in the shower, and defendant continued to read his newspaper. After D.I. finished getting ready, defendant took her to school. "Just before" defendant

took D.I. to school, he "grounded" her and took her tablet and cell phone because she "had to do community service hours at T.J."

¶ 28    At the conclusion of defendant's case, defense counsel moved for a directed verdict on counts I-IV, VII, and VIII, arguing, D.I.'s testimony was "so vague and so disparate that *** it couldn't even rise to a level of *prima fascia* [*sic*] *** with respect to those timeframes." The State responded D.I. testified "that she knows she was in fifth grade when this defendant started having her perform oral sex on him" and D.I. testified "it was before sixth grade that the defendant started placing his penis in her vagina, which would have—sixth grade would have started that—just after that summer" of 2011. The State continued, the reason the allegations contained in counts I, II, and VII ended on June 30, 2011, was because "the statute citation change[d]" on that date. The trial court ultimately denied defendant's motion. Subsequently, the jury found defendant guilty on all nine counts.

¶ 29    On May 30, 2018, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial in which he alleged, *inter alia*, the State failed to prove him guilty beyond a reasonable doubt and the court erred by denying his motion for a directed verdict with respect to count I. At defendant's sentencing hearing, the trial court first addressed defendant's motion. Defense counsel argued D.I.'s testimony that defendant first had vaginal intercourse with her when she was going into sixth grade "would indicate the fall of 2011" and not June 30, 2011, or before. Defense counsel continued, "[i]t could have been July 1, and while that might not be much of a difference, it's enough of a difference to take us out of that count." The State responded that D.I.'s testimony was "not that it happened the day before sixth grade, but before sixth grade started, that summer, which is the summer of 2011." After argument, the court denied defendant's motion and conducted the sentencing hearing. The court sentenced defendant

to 20 years on each of counts I-IV, 10 years on each of counts V-VI, and 5 years on each of counts VII-IX. The sentences on counts I-VI were to run consecutively, and the sentences on counts VII-IX were to run concurrently with each other, but consecutive to the other counts.

¶ 30    This appeal followed.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, defendant argues his convictions should be reversed because D.I. was not a credible witness and the State failed to prove him guilty beyond a reasonable doubt. In the alternative, defendant argues this court should reverse his conviction on count I because "the jury had no evidence upon which it could base its verdict and instead could only speculate the alleged conduct took place before July 1, 2011."

¶ 33    A. The Evidence Was Sufficient to Prove Defendant Guilty Beyond a Reasonable Doubt

¶ 34    Defendant first argues his convictions should be reversed because the State's proof, specifically D.I.'s testimony, was insufficient to establish his guilt.

¶ 35    When considering a challenge to the sufficiency of the evidence in a criminal case, the function of the reviewing court is not to retry the defendant. *People v. Lloyd*, 2013 IL 113510, ¶ 42, 987 N.E.2d 386. Instead, the reviewing court "considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted*.*) *People v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325. Under this standard of review, "[i]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. This court may not reverse a defendant's conviction "unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." (Internal

- 13 -

quotation marks omitted.) *Lloyd*, 2013 IL 113510, ¶ 42.

¶ 36      "It is the function of the jury as the trier of fact to assess the credibility of witnesses and to resolve discrepancies and inconsistencies in the evidence." *People v. Jackson*, 2020 IL 124112, ¶ 66. A reviewing court will not substitute its judgment for that of the jury on issues involving the credibility of witnesses. *Id.* ¶ 64.

¶ 37      To establish defendant committed predatory criminal sexual assault of a child, the State was required to show: (1) he was 17 years of age or older, (2) he committed an act of sexual penetration, and (3) D.I. was under 13 years of age when the act was committed. See 720 ILCS 5/12-14.1(a)(1) (West 2008); see also 720 ILCS 5/11-1.40(a)(1) (West Supp. 2011). To establish defendant committed criminal sexual assault, the State was required to show: (1) he committed an act of sexual penetration, (2) D.I. was a family member, and (3) D.I. was under 18 years of age at the time of the act. See 720 ILCS 5/11-1.20(a)(3) (West Supp. 2011). To establish defendant committed aggravated criminal sexual abuse in counts VII and VIII, the State was required to show: (1) he committed an act of sexual conduct with D.I., (2) he was 17 years of age or over, and (3) D.I. was under 13 years of age at the time of the act. See 720 ILCS 5/12-16(c)(1)(i) (West 2008); see also 720 ILCS 5/11-1.60(c)(1)(i) (West Supp. 2011). To establish defendant committed aggravated criminal sexual abuse in count IX, the State was required to show: (1) he committed an act of sexual conduct or sexual penetration with D.I., (2) he was at least 5 years older than D.I., and (3) D.I. was between the ages of 13 and 17. See 720 ILCS 5/11-1.60(d) (West Supp. 2011).

¶ 38      Here, defendant does not claim the evidence was insufficient to establish the ages and familial status of defendant and D.I. as elements of the charged offenses. Defendant asserts, however, in regards to the remaining elements of the charged offenses, D.I.'s testimony, which he notes "was the only evidence [defendant] touched her in an inappropriate manner," was not

- 14 -

credible and, thus, insufficient to convict him. Defendant acknowledges "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible ***." *People v. Gray*, 2017 IL 120958, ¶ 36, 91 N.E.3d 876. However, he contends D.I.'s testimony was not credible because (1) it "contradicted and embellished itself on several occasions," (2) it was "undercut by the defense witnesses who testified that D.I. was a consistent liar," and (3) there was no "physical evidence that would be expected to be found given D.I.'s testimony." We disagree.

¶ 39            By finding defendant guilty, the jury necessarily credited D.I.'s testimony over that of defendant and his other witnesses. The jury's decision to credit D.I.'s testimony is "entitled to great deference but is not conclusive and does not bind the reviewing court." See *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004). Instead, "where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* at 279. "Under this standard, the eyewitness testimony may be found insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." (Internal quotation marks omitted.) *Gray*, 2017 IL 120958, ¶ 36. "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.*

¶ 40            Defendant first asserts D.I.'s testimony was incredible because it "contradicted and embellished itself on several occasions." As an example of these contradictions and embellishments, defendant notes D.I. testified that "from fourth to ninth grade she was not allowed out of the house unless [defendant] came with her," even though, a short time later, D.I. "confirm[ed] that she did go on family vacations" and other outings without defendant. As another example, defendant notes D.I. testified defendant did not allow her to have a phone and prevented

her from contacting her mother but later testified after she reported defendant's conduct on December 4, 2014, "she texted her mother and knew how to contact her." Defendant also claims D.I.'s testimony at trial was the first time she ever reported defendant referred to the outfit he made her wear as her "wrestlers" and to his penis as a "footlong." The State acknowledges D.I.'s testimony contained the noted contradictions and embellishments.

¶ 41        We observe that while D.I.'s testimony might have been contradictory and embellished on certain points, the jury was made aware of the weaknesses in her testimony and nonetheless credited it as true. We cannot say it was unreasonable for the jury to have found D.I. credible. "[C]ontradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, she testified truthfully." *Gray*, 2017 IL 120958, ¶ 47. "In other words, it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283. Additionally, "where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable." *Gray*, 2017 IL 120958, ¶ 47. The noted contradictions and embellishments in D.I.'s testimony related to issues collateral to the ultimate question of whether defendant engaged in improper sexual conduct with D.I. Moreover, the material portions of D.I.'s testimony were consistent with the facts she relayed to Kennedy and Um.I. The facts D.I. recounted to Kennedy on December 4, 2014, regarding defendant's actions on December 3 were nearly identical to what she testified to at defendant's trial over three years later. Further, D.I. testified defendant had, on previous occasions before December 3, 2014, requested she wear the stockings and red flag shirt while he sexually assaulted D.I.. This was consistent with Um.I.'s later testimony that D.I. had informed her defendant "ma[de] [her] do inappropriate things she [didn't] want to voluntarily do" such as putting on "those pantihose [*sic*]

things," "get[ting] into shirts that show cleavage or show her breast," and "ma[king] her partake in sexual activity." A reasonable person could have been reassured as to the truthfulness of D.I.'s accusations against defendant based on the corroborating evidence, even in light of her testimony that contained contradictions and embellishments.

¶ 42    Defendant also argues the jury should have found D.I.'s testimony was incredible because it was "undercut by the defense witnesses who testified that D.I. was a consistent liar." However, as previously noted, it is the jury's responsibility and prerogative to determine issues relating to witness credibility. Although Hayes testified D.I. had a reputation as a "drama queen and a liar" and Oldham testified D.I. had a reputation for "l[ying] a lot," the jury also heard that Hayes's father was best friends with defendant and Oldham was defendant's sister. We cannot say that a reasonable person could not discount these witnesses' characterizations of D.I.'s reputation for untruthfulness in light of the witnesses' close ties to defendant.

¶ 43    Finally, defendant argues the State failed to prove him guilty beyond a reasonable doubt based on a lack of physical evidence that he had sexual contact with D.I. Defendant notes no semen or male DNA was found in D.I.'s vaginal swabs, no condoms or condom wrappers were found in the house, and no mid-thigh stockings were found in D.I.'s bedroom. However, as the State correctly points out, in a case where the victim has testified she was sexually assaulted, the absence of physical evidence does not mean the defendant has not been proven guilty beyond a reasonable doubt. See *People v. Back*, 239 Ill. App. 3d 44, 76, 605 N.E.3d 689, 710 (1992). It is simply one factor the jury must take into account when weighing the evidence. Here, D.I. affirmatively testified to the details of the sexual conduct for which defendant was ultimately found guilty. D.I. also testified that defendant used a condom during the sexual intercourse on December 3 and later flushed it down the toilet, explaining why no semen or used condom was found. Kari

Broaddus, a forensic scientist with the Illinois State Police Crime Laboratory also explained that the absence of other DNA in D.I.'s vaginal swab, taken nearly 30 hours after the December 3 intercourse, was "not surprising" because "there was no semen identified" in the swabs. Additionally, even though police did not uncover any mid-thigh stockings, Um.I. testified she and D.I. both had pantyhose at the house, and D.I. testified she puts stockings and pantyhose "in the same category." Here, a reasonable person could have believed D.I. was telling the truth about the sexual conduct even in the absence of physical evidence.

¶ 44       Viewing the evidence in the light most favorable to the State, we cannot say it was so improbable, unsatisfactory, or unreasonable as to justify a reasonable doubt of defendant's guilt.

¶ 45       B. The Evidence Was Sufficient to Support a Conviction on Count I

¶ 46       Defendant's second argument on appeal is that the State's evidence was insufficient to convict him on count I because "the jury had no evidence upon which it could base its verdict and instead could only speculate the alleged conduct took place before July 1, 2011."

¶ 47       In count I, the State charged defendant with committing predatory criminal sexual assault of a child between October 23, 2009, and June 30, 2011. In count III, the State alleged defendant committed the same offense and that it occurred between July 1, 2011, and October 22, 2012. Counts I and III both alleged vaginal intercourse. As indicated, the jury found defendant guilty of both counts and the trial court entered separate 20-year sentences. Defendant argues the only evidence arguably supportive of count I—the victim's testimony that she "was going into sixth grade" when the first vaginal intercourse occurred—fails to establish that the conduct occurred during the time period alleged. Instead, argues defendant, "going into sixth grade" could be a reference to any time during the summer of 2011, including July and August, which would obviously be beyond the period alleged.

¶ 48        The State's response is twofold. First, it argues D.I.'s testimony, as quoted above, was sufficient to establish the conduct occurred prior to June 30, 2011. Second, even if D.I.'s testimony that the first vaginal intercourse occurred when she "was going into sixth grade" fails to establish the conduct occurred within the time period specified in the charging instrument, a permissible variance exists.

¶ 49        As to the State's first argument, D.I.'s testimony that the first vaginal intercourse occurred when she "was going into sixth grade" *could* be consistent with the conduct having occurred in early to mid-summer of 2011. However, it could also be consistent with it having occurred in July or August as well. Without further clarification, D.I.'s testimony that the first vaginal intercourse occurred when she "was going into sixth grade" does not specifically place the conduct in the timeframe referenced in count I.

¶ 50        The State also argues that any disparity found to exist between the timeframe alleged in count I and what was testified to by D.I. constituted a permissible variance. "The date alleged in the charging instrument ordinarily need not be proved precisely and any irregularity between the [charging instrument] and proof establishing the offense was committed on a date other than that precisely alleged is not a fatal variance." *People v. Smith*, 337 Ill. App. 3d 819, 824, 786 N.E.2d 1121, 1125 (2003). In arguing its claim of a permissible variance, the State suggests D.I.'s testimony she "was going into sixth grade" was close enough to the timeframe alleged in count I—October 23, 2009, to June 30, 2011—to support defendant's conviction on that count. We agree. Our supreme court has stated "that it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time." *People v. Bishop*, 218 Ill. 2d 232, 247, 843 N.E.2d 365, 374 (2006). Here, we think D.I.'s testimony was sufficient

- 19 -

to establish defendant committed the offense either within, or in close proximity to, the timeframe alleged in count I.

¶ 51    Further, in child sex offenses cases, "[t]he date of the crime is not an essential element of the offense when the statute of limitations is not questioned." *People v. Letcher*, 386 Ill. App. 3d 327, 331, 899 N.E.2d 315, 320 (2008). Here, the statute of limitations was not set to expire on count I until 2037. See 720 ILCS 5/3-6(j) (West 2008). Thus, defendant has failed to establish the evidence was insufficient to support his conviction on count I.

¶ 52                               III. CONCLUSION

¶ 53    For the reasons stated, we affirm the trial court's judgment.

¶ 54    Affirmed.