NOTICE

Decision filed 05/06/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190411-U

NO. 5-19-0411

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 15-CF-274 |
| | ) | |
| RODNEY E. BLACK, | ) | Honorable |
| | ) | Todd D. Lambert, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Barberis and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where no reversible error occurred in the conviction or sentencing of the defendant, and any argument to the contrary would lack substantial merit, the defendant's appointed attorney on appeal is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 2    The defendant, Rodney E. Black, was found guilty of aggravated battery and was sentenced to 20 years in prison. The circuit court denied his motion for new trial and his motion to reconsider sentence. The defendant now appeals from the judgment of conviction. The defendant's appointed counsel on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit. On that basis, OSAD has filed with this court a motion to withdraw as counsel and a supporting brief. See *Anders v. California*, 386 U.S. 738 (1967). The defendant has filed a response, objecting to OSAD's motion. This court has examined OSAD's *Anders* motion and

1

brief, the defendant's response, and the entire record on appeal. Having concluded that this appeal does indeed lack merit, this court must grant OSAD's motion to withdraw and must affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4       In September 2015, the defendant was charged with aggravated battery (720 ILCS 5/12-3.05(a)(3) (West 2014)). He was accused of causing great bodily harm to Drake A. Miller, a person whom he knew to be a correctional institution employee performing his official duties, by striking him in the face.

¶ 5       In February 2019, the cause proceeded to trial by jury. Drake Miller testified that he started as a correctional officer at the Saline County jail in February 2015. On the morning of September 15, 2015, he was on duty and dressed in his correctional officer's uniform as he "work[ed] the floor" at the jail. The defendant, who was an inmate there, handed Miller an envelope to give to Lieutenant Jill Bennett, the jail's supervisor. Miller took the envelope and placed it on the desk near the control room. When Miller told the defendant what he had done with the envelope, the defendant asked Miller to retrieve the envelope and return it to him. The defendant also expressed his displeasure by "screaming very loudly that [Miller] was a bitch." Miller, in turn, told the defendant something along the lines of, "you're going to call me a bitch. We all know what you're charged with ***." Miller retrieved the envelope from the desk and returned it to the defendant.

¶ 6       Later that morning, Miller was collecting mop buckets. The defendant stopped him and said that his toilet was not functioning properly. Because the defendant appeared to have calmed down, Miller saw no problem in calling for the cell door to be opened. Once it was opened, Miller stepped inside the defendant's cell. The two were alone in there. Then, the defendant "struck" Miller in one eye. Stunned, Miller "stumbled backwards out of the cell." The defendant followed

him out and continued striking him. Two or three other correctional officers arrived on the scene, and they gained control of the defendant. Not long afterward, Miller was taken to the emergency room of a Harrisburg hospital, and from there to a hospital in Evansville. He was found to have suffered "an orbital blow out on [his] right eye." At a later date, this injury required "a surgery to repair the hole."

¶ 7    Dr. Hisham Youseff, a diagnostic radiologist who interpreted CAT scans taken of Drake Miller's head on September 15, 2015, testified that Miller had suffered "blow-out fractures of the floor and medial wall of the right orbit." A blow-out fracture, Dr. Youseff explained, involves multiple cracks in a bone, and the orbit is "a cone-shaped structure with the eyeball in the very front." The bones, which are "paper thin," fractured "as the eye went into the socket." Meanwhile, the "inferior rectus muscle *** had descended into the fracture and was stuck on a piece of bone."

¶ 8    Chuck Gibbs testified that on September 15, 2015, he was employed as a correctional officer at the jail, and was working in the control room, where he monitored cameras and opened and closed doors. Gibbs was familiar with the defendant. Correctional officer Drake Miller asked Gibbs, via radio, to open the defendant's door. Gibbs looked down the hall and saw Miller standing outside the defendant's door. Seeing no reason not to open the door, Gibbs opened it, and he saw Miller step in. "[A] few seconds later," he saw Miller came back out of the cell, with the defendant following him out. Gibbs saw "arms moving around, punches being thrown" as he radioed other officers to assist. Just then, Lieutenant Jill Bennett came into the control room to relieve Gibbs, so that he, too, could go down the hall to assist. By the time Gibbs arrived, other officers had gained control of the defendant. Gibbs observed that Miller had a "swollen eye."

¶ 9    Jill Moore, a correctional officer at the jail, was on duty in the medical room, across from the control room, on September 15, 2015. With the medical room's door open, she could hear the

3

defendant and correctional officer Drake Miller conversing—normally at first, but then the defendant started "yelling" at Miller and calling him "a mother fucker and stuff like that." Miller reacted calmly, going about his work. Later, at the next cell check, the defendant asked Miller to check his toilet. She heard Miller ask the control room to open "cell 128," and the control room did so. "[A]fter that, you could hear scuffling down the hallway," and "you knew that they were in a fight." Moore ran out of the medical room toward cell 128. She saw the defendant "hit Drake Miller in the face *** when they were in the hallway fighting." Officers quickly gained control of the defendant.

¶ 10 Defense counsel began the cross-examination of Jill Moore by asking her whether she recalled making a report about the incident, and she answered in the affirmative. "And do you recall," defense counsel continued, "what time you put down that you say you heard Officer Miller and [the defendant] arguing?" At that point, the judge interrupted, saying, "Ma'am, I don't want you to look at anything, I want you to answer the question." Moore answered, "It was approximately 9:15." Then, defense counsel asked Moore whether it would refresh her memory to look at her report, and whether she had the report, and she answered in the affirmative to both. The court allowed her to refresh her recollection, and she answered, "Yeah, it happened around 9:15 in the morning." Defense counsel proceeded to ask Moore about the timing of Miller and the defendant's interactions. The judge interjected, "Ma'am, may I have your report? I want you to give me everything you've got." The cross-examination continued. Redirect and recross examinations followed. Neither defense counsel nor the State objected to any question posed, or to anything else, during Moore's testimony, and neither moved to strike any portion of her testimony.

¶ 11    A videotape of the altercation between the defendant and correctional officer Miller was played for the jury.  It showed Miller walking down a hallway of the jail and being stopped by someone in a cell, off-camera.  Miller lingered outside the cell for a short while, then stepped inside the cell.  For approximately three seconds, Miller was off-camera.  Then, Miller quickly backed out of the cell, with the defendant closely following him.  The defendant landed one solid blow upon Miller, and he swung approximately two more times.  Miller attempted to swing, without much success.  After but a few seconds, other correctional officers appeared.  They dragged the defendant to the floor and handcuffed him.

¶ 12    The defendant testified in his own defense.  According to the defendant, on September 15, 2015, he handed correctional officer Drake Miller a letter and asked him to give it to Lieutenant Jill Bennett.  The letter concerned the defendant's ear infection and the longer-than-allowed delay in having it treated.  A bit later, Miller told the defendant that he had placed the letter on the desk in front of the control room, instead of giving it to Bennett personally.  The defendant knew that placing the letter on that desk would result in a day's delay in getting the letter to Bennett, and he asked Miller to retrieve the letter and return it to him.  The defendant was "visibly upset" about the delay in treatment of his ear infection.  At approximately 8:45 a.m., Miller returned the letter to the defendant.  The defendant called Miller a "bitch," though he did not yell.  Miller replied, "you've got a lot of nerve calling me a bitch.  Look what you're in here for."

¶ 13    The defendant's next interaction with Miller occurred approximately 30 minutes later, when he told Miller that there was a problem with the toilet in his cell.  Miller "popped the cell door" and stepped in.  The defendant asked him, "what was you talking about earlier?"  The defendant was "upset" when he asked this question, but he "wasn't out of control angry."  Furthermore, he had no intention of attacking Miller.  However, Miller adopted "an aggressive

5

stance" and swung at the defendant, hitting him in the forehead. Then, the defendant swung at Miller, but missed; he swung again, and hit him. Miller "swung back at me. By that time, we're in the hallway." According to the defendant, the video showed Miller swinging at him. The defendant did not have any altercation with Miller prior to that day.

¶ 14    The defendant called one other witness. Aaron Mattingly testified that he was serving sentences for burglary and possession of a stolen vehicle in the Vienna Correctional Center. On September 15, 2015, Mattingly was an inmate at the Saline County jail, and was housed two doors down from the defendant, on the same side of the hallway. In the morning, Mattingly was in his cell when he heard the defendant and correctional officer Miller arguing and exchanging curse words. Then, he heard the defendant's door open. Mattingly walked to his cell door, and he saw a "scuffle" ensue. The defendant and Miller were "running around" and "rolling around" in the hallway. Mattingly thought that Miller had "let his emotions get the better of him."

¶ 15    The lawyers made their closing arguments. Defense counsel relied on the affirmative defense of self-defense. See 720 ILCS 5/7-1(a) (West 2014) ("A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force."). After deliberating briefly, the jury returned a verdict finding the defendant guilty of aggravated battery.

¶ 16    On March 14, 2019, the defendant filed, by counsel, a motion for new trial. Aside from general claims relating to the alleged insufficiency of the evidence, the defendant claimed (1) "[t]hat during trial, witness Jill Moore kept looking at her notes," (2) that "[w]hen defendant took the stand, the state gave his address as the Saline County Jail," and (3) that "during voir dire,

6

defense counsel asked jurors if they could weigh defense witnesses [*sic*] testimony fairly if they were in restrains [*sic*] and then said witnesses were not in restraints when they testified."

¶ 17    On April 26, 2019, the court held a hearing in aggravation and mitigation.  (A hearing on the motion for new trial was put off until a later date.)  The State informed the court that on April 11, 2019, a Saline County jury had found the defendant guilty of first degree murder and intentional homicide of an unborn child.  The State recommended "the maximum term of imprisonment", while defense counsel recommended "the minimum of six years."  The defendant was sentenced to imprisonment for 20 years and mandatory supervised release for 3 years.

¶ 18    On May 20, 2019, the defendant filed a *pro se* motion to reduce sentence.  On August 5, 2019, the defendant, by counsel, filed a motion to reconsider sentence.

¶ 19    On August 9, 2019, the court heard argument on the motion for new trial and the motion to reconsider sentence.  Defense counsel largely stood on his motions.  The court took the matters under advisement.

¶ 20    On August 27, 2019, in a short docket-entry order, the circuit court denied the motion for new trial and the motion to reconsider sentence.

¶ 21    The defendant perfected the instant appeal, and the circuit court appointed OSAD to represent him.

¶ 22                                  ANALYSIS

¶ 23    As previously noted, OSAD has concluded that this appeal lacks merit, and has filed an *Anders* motion to withdraw as the defendant's attorney on appeal.  In its *Anders* brief, OSAD presents (no fewer than) five potential issues that could be raised on appeal—the three very specific issues that were raised in the defendant's motion for a new trial, plus the issues of whether the

7

defendant was proved guilty beyond a reasonable doubt and whether his sentence was excessive. This court will consider each of the five.

¶ 24    The first potential issue raised by OSAD appeared in the defendant's motion for a new trial, wherein the defendant claimed "[t]hat during trial, witness Jill Moore kept looking at her notes." The defendant did not say anything else about this claim in his motion for new trial, and defense counsel did not discuss this claim at the August 9, 2019, hearing on the motion. Jill Moore's referring to her notes was first mentioned during her cross-examination by defense counsel. Defense counsel was asking Moore about the report that she had written regarding the argument between the defendant and correctional officer Miller. Counsel asked, "And do you recall what time you put down that you say you heard Officer Miller and [the defendant] arguing?" At that point, the judge interrupted, saying, "Ma'am, I don't want you to look at anything, I want you to answer the question." That was the first indication that Moore was referring to notes during her testimony. Moore answered, "It was approximately 9:15." Then, defense counsel asked Moore whether it would refresh her memory to look at her report, and whether she had the report, and she answered in the affirmative to both. The court allowed her to refresh her recollection, and she answered, "Yeah, it happened around 9:15 in the morning." Defense counsel proceeded to ask Moore about the timing of Miller and the defendant's interactions. The judge interjected, "Ma'am, may I have your report? I want you to give me everything you've got." That was the last reference to Moore's report until after her testimony had ended, when the judge returned her report to her.

¶ 25    Defense counsel seemed unbothered by Moore's referring to her notes; he never objected to her referring to them, and never asked to have any portion of her testimony stricken. It is impossible to discern any legal ground for concluding that reversible error occurred in Moore's

8

referring to her notes, or that the trial's outcome would have been different if Moore had not looked at her notes. This claim would be entirely frivolous.

¶ 26    The second potential issue raised by OSAD also appeared in the defendant's motion for a new trial. The defendant claimed that "[w]hen defendant took the stand, the state gave his address as the Saline County Jail." This statement is incorrect. First, the State did not call the defendant to testify; defense counsel called him. After the defendant took the stand, defense counsel asked him to state his name, which he did. Then, defense counsel asked, "And you're currently an inmate at the Saline County Jail?" and the defendant answered, "That's correct." No error occurred in this exchange.

¶ 27    The third potential issue raised by OSAD was the defendant's claim, in his motion for a new trial, that "during voir dire, defense counsel asked jurors if they could weigh defense witnesses [*sic*] testimony fairly if they were in restrains [*sic*] and then said witnesses were not in restraints when they testified." In other words, the defendant claimed that defense counsel asked prospective jurors whether they could fairly weigh testimony if it came from witnesses who were imprisoned and possibly in restraints, but when the defendant's witnesses actually testified, they were not in restraints. This court notes that the defendant called only one witness, other than himself, to testify at trial—Aaron Mattingly, who was an inmate in the Department of Corrections (DOC). At the time of *voir dire*, defense counsel certainly knew that he was going to call Mattingly to testify, and he certainly may have suspected that DOC personnel would have Mattingly in restraints. There was nothing wrong with attempting to ensure, before Mattingly testified, that the jury would not disbelieve Mattingly solely because he was in restraints. When Mattingly (apparently) testified without any restraints, it may have been seen as an acknowledgment that Mattingly was not dangerous, which could only benefit the defendant. This is another pointless issue.

9

¶ 28    The fourth potential issue raised by OSAD in its *Anders* brief is whether the defendant was proved guilty beyond a reasonable doubt. "[A] criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48. Where a defendant challenges his conviction on the basis of insufficient evidence, the reviewing court will consider all the evidence in the light most favorable to the State, and then it will determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). A reviewing court will not retry the defendant. *In re Q.P.*, 2015 IL 118569, ¶ 24.

¶ 29    Here, the defendant was convicted of aggravated battery. As charged herein, a person commits aggravated battery when he, in committing a battery other than by discharge of a firearm, knowingly causes great bodily harm to an individual whom the person knows to be a correctional institution employee performing his official duties. 720 ILCS 5/12-3.05(a)(3) (West 2014). Both correctional officer Miller and the defendant testified at trial. According to Miller, the defendant threw and landed the first punch, suddenly and without provocation, causing Miller to stumble backward out of the defendant's cell as the defendant followed up with additional punches, thereby causing serious injury to Miller. According to the defendant, Miller threw and landed the first blow, and the defendant merely defended himself against an unprovoked attack. Apparently, the jury believed Miller's version of events, as it had a right to do. It is within the province of the jury "to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. (Additionally, a video recording, which captured part of the incident, supported Miller's version of events. It showed Miller backing out of the defendant's cell and the defendant pursuing him while throwing additional punches, beyond

10

anything that self-defense would permit.) A rational trier of fact certainly could have found the defendant guilty.

¶ 30 Finally, OSAD raises the potential issue that the defendant's sentence was excessive. Aggravated battery, as charged in the instant case, is a Class 1 felony. 720 ILCS 5/12-3.05(h) (West 2014). The defendant had a very serious criminal history, with numerous felony and misdemeanor offenses, dating back to 1980, which included several trips to the penitentiary. Because the defendant had two or more convictions for felony offenses of Class 2 or greater, he had to be sentenced as a Class X offender. 730 ILCS 5/5-4.5-95(b) (West 2014). Therefore, the defendant's permissible range of imprisonment was 6 to 30 years. *Id.* § 5-4.5-25(a). "A sentence within the statutory limits will not be disturbed absent an abuse of discretion." *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). The actual sentence imposed on the defendant was 20 years, which was well within the statutory limits. This sentence was not excessive, and did not represent an abuse of discretion, especially in light of the defendant's long and serious criminal history and the significant harm done to correctional officer Miller, whose injuries required surgery.

¶ 31                                    CONCLUSION

¶ 32 As the foregoing analysis suggests, this appeal does not present any issue of arguable merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of conviction, entered by the circuit court, is affirmed.


¶ 33 Motion granted; judgment affirmed.