NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231519-U

NO. 4-23-1519

IN THE APPELLATE COURT

FILED
September 10, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| NORMAN R. PELLETT, | ) | No. 23CF21 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed, concluding the evidence was sufficient to sustain defendant's conviction for criminal sexual abuse.

¶ 2     Following a bench trial, defendant, Norman R. Pellett, was found guilty of one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2022)). The trial court sentenced defendant to 24 months of conditional discharge. Defendant appeals, arguing the State did not prove him guilty beyond a reasonable doubt. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4                         A. Defendant's Charge

¶ 5     On January 17, 2023, the State charged defendant by information with one count of criminal sexual abuse (*id.*) stemming from an incident that occurred on January 14, 2023, between defendant and the victim, L.S. The State alleged defendant "committed an act of sexual

conduct by use of force with [L.S.] by placing his penis on the vagina of [L.S.]" while he was a resident of the El Paso Health Care Center (El Paso Health) where L.S. was a certified nursing assistant (CNA).

¶ 6                                      B. Bench Trial

¶ 7          On May 22, 2023, defendant waived his right to a jury trial. The trial court conducted a bench trial on October 11, 2023.

¶ 8                                      1. *The State's Evidence*

¶ 9                                      a. L.S.

¶ 10          L.S. testified she had been a CNA for 34 years and had worked at El Paso Health for 14 months. On January 14, 2023, L.S. began her shift at El Paso Health at 2 p.m. and was scheduled to work until 10 p.m. On that day, defendant was in a wheelchair. At approximately 5 p.m., L.S. was walking down defendant's hallway with laundry when defendant approached her and "wanted [her] to look at a sweater to see if it would fit maybe another resident because it was too small for him." L.S. did not find this request to be out of the ordinary, as the residents "like to share their clothes with other residents that are less fortunate." L.S. then walked behind defendant as he wheeled himself to his room. Nobody else was in the room when L.S. and defendant entered, and L.S. did not see a sweater. The door to the room remained open. Defendant stood up from the wheelchair and turned around towards L.S. The wheelchair rolled away from defendant. Defendant told L.S. "the sweater is not what he really wanted." Defendant then grabbed L.S.'s scrub shirt with his right hand and pulled her closer to him. Defendant let go of L.S. and then, with his right hand, pulled his pants down and pulled L.S.'s pants and underwear down. L.S. tried to push defendant's hand away. Defendant started to rub his erect penis on L.S.'s vagina. While there was no penetration, there was still "skin-to-skin" contact.

L.S. "kind of blacked out" and "froze a little bit," which is why she did not run away at that moment. L.S. then told defendant she thought she heard his roommate nearby and was thus "able to break away from [defendant]" and "r[u]n down the hall" to the nurses' station. L.S. was "hysterical." L.S. "told the nurses that [defendant] attempted to rape [her.]" L.S. went into the break room and her coworkers called the police and an ambulance. L.S. was "crying," "upset," "nervous," "scared," and "a mess." L.S. spoke with El Paso police officer Charles Barth and was thereafter taken to a hospital to be examined. L.S. was at the hospital for two to three hours.

¶ 11                                  b. Rebecca Travis

¶ 12        Rebecca Travis was one of L.S.'s coworkers at El Paso Health and was working on January 14, 2023. Travis heard L.S. scream. Travis ran around the corner, saw L.S. running down the hallway "hysterical," and heard her say, "[H]e raped me, he raped me." Travis and other coworkers took L.S. into the break room, where L.S. repeated that defendant raped her. A coworker called the police, who arrived shortly thereafter with paramedics. When L.S. was being taken out of El Paso Health to be transported to the hospital, "she was still hysterical, crying, screaming, scared to death. Still saying that [defendant] had raped her. And she still was not calm when she did leave."

¶ 13                                  c. Officer Charles Barth

¶ 14        El Paso police officer Charles Barth responded at approximately 5 p.m. on January 14, 2023, to the call from El Paso Health regarding an alleged sexual assault. Upon arrival, Officer Barth proceeded to the break room, where he met with L.S. Officer Barth explained L.S. "was visibly distraught and being comforted by her co-workers. She was crying, shaking, in an almost fetal position while sitting there." L.S. informed Officer Barth "that she was lured into [defendant's] room where [he] pulled down her pants and stuck his penis between

her legs making contact with her vagina." Officer Barth spoke with defendant and asked what happened between him and L.S. Defendant "denied having any contact with [L.S.] at that time" and said he was only going to show L.S. a sweater in his room. Officer Barth saw the sweater on defendant's bed. Defendant then told Officer Barth he gave L.S. "a hug" while they were down the hallway before going to his room. (L.S. confirmed this.) When the officer indicated he would be investigating the incident further, defendant "changed his story." Specifically, defendant reported L.S. "came on to him" and "there was a consensual sexual encounter with [L.S.] where she began rubbing the outside of his clothed pants, rubbing the outside of his penis, and then removed his penis from his pants and placed it between her legs." Defendant was "cool, calm, and collected" at this point in the conversation. But after admitting he had sexual contact with L.S. and being informed he was being arrested, defendant "became hysterical." Officer Barth then left El Paso Health and followed the ambulance to the hospital where L.S. would undergo a sexual assault examination. Officer Barth remained with L.S. for approximately two to three hours. L.S. was upset the entire time.

¶ 15                                    2. *Defendant's Evidence*

¶ 16                                    a. Jody Burdell

¶ 17          Jody Burdell was a resident of El Paso Health for a little over one year and was defendant's roommate for approximately eight months. In the evening on January 14, 2023, Jody saw defendant wheel himself to the nurses' station with a sweater, asking if anyone wanted it. L.S. took it and asked if she could keep it. According to Jody, L.S. said "[s]he wanted to smell his smell." Jody thought he saw L.S. kiss defendant on the neck, but it was possible she merely hugged him. Jody saw defendant go back to his room alone. Jody then went outside to smoke.

When Jody came back inside, he saw L.S on a stretcher crying. Jody went back to his room and saw defendant speaking with police.

¶ 18                                                     b. Defendant

¶ 19             Defendant had lived at El Paso Health for 13 months due to a traumatic brain injury from a car accident. Defendant and L.S. "got to know each other" during his time there. Defendant had been in a wheelchair for approximately four years. Defendant is able to stand but has to "hold onto things." On January 14, 2023, defendant returned to El Paso Health from visiting his wife and dog for the preceding three days. Defendant obtained his daily medication and "said hi to Jody." Defendant then "turned around" and L.S. "came up to greet [him]" near the nurses' station. According to defendant, "[t]he initial greeting was the start of things." Defendant explained:

> "I came in. I was sitting there. [L.S.] came up to give me—she gave me a real big hug, and she kissed me on the neck, and she asked me where I had been, that she missed me. And then she kneeled down in front of me, and she was rubbing my leg."

¶ 20             Defendant went to his room to unpack. While unpacking, defendant found "a sweatshirt in [his] stuff that was too small for [him]." Defendant took it to the nurses' station and inquired if anyone wanted it. L.S. said she wanted it and wanted the sweater to smell like defendant. L.S. "gave [defendant] another hug," and they both went to his room, where he put the sweater on the bed. The door to the room remained open. When asked what happened next, defendant explained:

> "Then I turned around, I stood up by my wheelchair, my wheelchair leaning up against my desk and my left arm holding onto my wheelchair,

- 5 -

and [L.S.] started giving me a hug. Then she put her arms around my neck, and she pulled herself up, and she wrapped her legs around my waist, and she started to gyrate on me."

¶ 21 Defendant "almost fell down and dropped [L.S.]" L.S. then began to rub defendant's penis on the outside of his pants. When asked what happened next, defendant explained:

"Then I bent over, and I started to rub [L.S.] But I can't bend that long. So—and the position we were in wasn't working very well, so that was out. So then I stood back up, and she grabbed my penis out of my pants. She pulled it out of my pants and started masturbating it that way."

¶ 22 L.S. then "got the end of [defendant's] penis into the top of her pants and then [he] started to fall over." L.S. only pulled her pants "out." L.S.'s pants "were never down." According to defendant, his penis never made contact with L.S.'s vagina, though his penis was being "pinch[ed]" by the top of her pants. Defendant and L.S. both thought Jody was coming back into the room. L.S. then "calmly walked around and out the door, stood in the doorway by [defendant's] room and [adjusted] her clothes. And then she just walked down the hallway." Defendant did not hear any "commotion" for at least five minutes.

¶ 23 Defendant spoke with Officer Barth twice. (According to defendant, Officer Barth took pictures during the first conversation.) Defendant agreed that he initially denied having any sexual contact with L.S. but later admitted there was "a little hanky panky" between them. Later, defendant disclosed what happened in more detail to Officer Barth "[b]ecause he came and told [defendant] *** if I find even one pubic hair on her, you're going to go to prison for a very long time." Defendant thought, "oh, this must be serious. So then [he] told him the whole truth."

¶ 24 On cross-examination, defendant changed his previous statement of L.S. having "wrapped her legs around [his] waist" to say that L.S. put one of her knees on the arm of his wheelchair and that he held her other knee with his right hand. Defendant admitted he knew L.S. was a lesbian and was married to a woman, but she told him around Christmas the previous year that he was the first man she was interested in in 30 years. Defendant also claimed L.S. had touched him sexually on prior occasions.

¶ 25 3. *The State's Rebuttal Evidence*

¶ 26 a. Officer Charles Barth

¶ 27 Officer Barth was recalled to the stand. Officer Barth testified he only spoke with defendant once and did not take any pictures. During this conversation, defendant never told the officer he and L.S. engaged in "hanky panky" (after initially denying any contact whatsoever) and never said she began to fondle his genitals. Defendant never stated L.S. could not pull her pants down. Defendant claimed his penis made contact with L.S.'s vagina in a consensual sexual encounter. Defendant never told the officer anything about alleged prior incidents of L.S. touching him in a sexual manner.

¶ 28 b. L.S.

¶ 29 L.S. was recalled to the stand. L.S. testified it was "commonplace" for people at El Paso Health to give each other hugs. L.S. denied telling defendant she was romantically interested in him. L.S. denied rubbing defendant's leg after he returned to El Paso Health on January 14, 2023, and denied telling defendant she wanted his sweater to smell like him. L.S. denied wrapping her legs or arms around defendant when she went to his room to look at the sweater and denied defendant held her and nearly fell over. L.S. was 110 pounds and defendant would not be able to hold her. L.S. testified defendant was able to pull her underwear down.

¶ 30                    4. *The Verdict and Sentence*

¶ 31        After hearing argument from the attorneys, the trial court delivered its verdict.

"Well, under either story we have sexual contact. So really this case comes down to was it done by force. And ultimately I believe [L.S.]. And the reason I believe [L.S.] is because of the—for a variety of reasons, but one of the primary reasons is the evidence regarding the prolonged and immediate emotional reaction of [L.S.].

* * *

*** I mean, her story makes sense. She was—she was a professional working at this home, and she is interacting with *** defendant, and he conducts himself inappropriately.

I mean, given his description of his disabilities, it's very hard to understand—it's very hard to understand how he supported her weight. ***

*** And, quite honestly, in considering the immediacy of the emotional reaction, the evidence, the independent evidence of that emotional reaction, the unwavering description by [L.S.] of what occurred as compared to the wavering description of what took place from [defendant], there is no doubt in my mind as to what took place, and I find *** defendant guilty."

The trial court sentenced defendant to 24 months of conditional discharge.

¶ 32        This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34         On appeal, defendant argues the State failed to prove him guilty beyond a

reasonable doubt of criminal sexual abuse. Specifically, defendant contends that while it was

undisputed he engaged in sexual conduct with L.S., the trial court erred in finding he engaged in

the use of force and the contradictions in L.S.'s testimony rendered the court's credibility

determinations unreasonable.

¶ 35         Our supreme court has explained the review of a defendant's challenge to the

sufficiency of the evidence as follows:

               "In reviewing the sufficiency of the evidence in a criminal case, our

        inquiry is whether, after viewing the evidence in the light most favorable to

        the prosecution, any rational trier of fact could have found the essential

        elements of the offense beyond a reasonable doubt. [Citation.] All

        reasonable inferences from the evidence must be drawn in favor of the

        prosecution. [Citation.] This standard of review does not allow the

        reviewing court to substitute its judgment for that of the fact finder on

        questions involving the weight of the evidence or the credibility of the

        witnesses. [Citation.] In weighing evidence, the trier of fact is not required

        to disregard inferences which flow normally from the evidence before it,

        nor need it search out all possible explanations consistent with innocence

        and raise them to a level of reasonable doubt. [Citation.] This court will not

        reverse a criminal conviction unless the evidence is so unreasonable,

        improbable, or so unsatisfactory as to justify a reasonable doubt of the

defendant's guilt. [Citation.]" (Internal quotation marks omitted.) *People v. Hardman*, 2017 IL 121453, ¶ 37.

¶ 36    We will not reverse a conviction simply because the evidence is contradictory or because the defendant claims a witness was not credible. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Where contradictions or flaws are shown to exist as to part of the testimony of a witness, it is the role of the factfinder to judge how those contradictions or flaws affect the credibility of the testimony as a whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). That said, while a factfinder's determination of witness credibility is entitled to great deference, its decision to accept testimony is neither conclusive nor binding on a reviewing court. *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Cunningham*, 212 Ill. 2d at 280). Its acceptance of testimony must be reasonable, and in some cases the reviewing court may find, "after considering the whole record, that flaws in testimony made it impossible for any fact finder reasonably to accept any part of it." *Cunningham*, 212 Ill. 2d at 283.

¶ 37    Defendant was charged with criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2022)). To prove criminal sexual abuse, the State was required to show defendant committed "an act of sexual conduct by the use of force or threat of force." *Id.* Sexual conduct is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs *** of the victim or the accused, *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. Defendant challenges only whether the State proved beyond a reasonable doubt he engaged in the use of force during his sexual conduct with L.S.

¶ 38    Force is defined as "the use of force or violence" and includes, but is not limited to, when the defendant "overcomes the victim by use of superior strength or size, physical

- 10 -

restraint, or physical confinement." *Id.* There is no precise standard establishing the requisite amount of force, and each case must be considered on its own facts. *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 (citing *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52)). The force necessary to prove the offense requires something more than the force inherent in the sexual touching itself. *Id.* ¶ 38. When evaluating whether force was used, we may consider the size and strength of the defendant and the victim, along with the place and conditions under which the incident occurred. *Id.* (citing *People v. Hines*, 105 Ill. App. 3d 35, 37 (1982)).

¶ 39        The evidence before the trial court established that while L.S. and defendant hugged each other near the nurses' station and she followed him back to his room, he told her he did not really want to talk with her about donating his sweater—the pretense under which he invited her to follow him to his room. He then grabbed her scrub shirt, pulled her (weighing only 110 pounds) close to him, pulled down his pants along with her pants and underwear, and rubbed his penis on her vagina. This was an act of sexual conduct entailing significantly more force than that inherent in the sexual touching itself. *Id.* ¶ 38. Moreover, with respect to the place and conditions in which the incident occurred (*id.*), L.S. was at El Paso Health, her workplace, which catered specifically to people with mental health issues, and had worked as a CNA for 34 years. In this place and under these conditions, it was reasonable for the court to conclude L.S., a healthcare professional with decades of experience and who was familiar with her responsibility to appropriately interact with vulnerable patients in her care, would not have initiated or consented to an incident of sexual conduct with one of the patients. Additionally, the evidence established L.S. is a lesbian and is married to a woman, reducing any likelihood she would have initiated or consented to an incident of sexual conduct with defendant. Most significantly, the use of force was corroborated by the testimony of L.S., Travis, and Officer Barth regarding L.S.'s

immediate, prolonged, and highly distraught reaction to the incident (running down the hallway and yelling that defendant raped her) and her highly emotional state during her conversation with Officer Barth and her time at the hospital (crying, shaking, and almost in a fetal position). Additionally, Jody testified he saw L.S. on a stretcher crying after he came back inside from smoking. Having viewed the evidence and drawn the natural inferences in the light most favorable to the prosecution, this court concludes the evidence was sufficient for a rational factfinder to find the elements of the offense of criminal sexual abuse proven beyond a reasonable doubt. *Hardman*, 2017 IL 121453, ¶ 37.

¶ 40　　　　This court disagrees with defendant's contention that L.S.'s testimony contains "contradictions," rendering the trial court's credibility determinations unreasonable. Defendant contends it is "contradictory" for L.S. to testify she pushed defendant's hands away while being "frozen" upon his sexual contact with her. However, L.S. testified she "froze a little bit" to explain why she did not run away at that moment. In this sense, it is not contradictory for L.S. to freeze where she was and nonetheless push defendant's hands away.

¶ 41　　　　Defendant also claims "[L.S.'s] description of how [defendant] was able to restrain her and accomplish the sexual contact also defies logic." Specifically, defendant argues it is "unclear" how he could grab L.S.'s shirt, pull her close to him, pull down his and her pants, and rub his penis on her vagina all with his right hand. Moreover, L.S. "seemed to change her story and admit that [defendant] was not restraining her during all parts of the encounter." However, L.S. did not testify defendant never broke his contact with her with his right hand. Naturally, defendant had to break the contact between his right hand and L.S.'s body in the course of grabbing her, pulling her towards him, pulling down both of their pants (and her underwear), and rubbing his penis on her vagina. It is not a contradiction for L.S. to testify

defendant engaged in all the physical and sexual conduct in this incident with his right hand and occasionally broke his contact with her from that same hand.

¶ 42     Finally, defendant contends there were contradictions in Travis's and L.S.'s accounts of what occurred. Specifically, while Travis testified she encountered L.S. running in the hallway and heard L.S. exclaim defendant raped her, L.S. testified she told the nurses at the nurses' station about the rape only after running there, failing to mention this to Travis in the hallway. The discrepancy between the testimony of the victim and the testimony of an independent witness about *precisely* what occurred, *precisely* when, and *precisely* where in the immediate aftermath of the incident, where, under either account, L.S. ran out of defendant's room screaming he had raped her, has no bearing on the material issue of whether an act of forcible sexual conduct occurred in defendant's bedroom moments earlier. "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief. [Citation.] In addition, where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable." *Gray*, 2017 IL 120958, ¶ 47. The trial court's decision to accept L.S.'s testimony as the more credible account of the incident was not unreasonable.

¶ 43     In sum, having viewed the evidence and drawn the natural inferences in the light most favorable to the prosecution, this court concludes the evidence was sufficient for a rational factfinder to find the elements of the offense of criminal sexual abuse proven beyond a reasonable doubt. *Hardman*, 2017 IL 121453, ¶ 37.

¶ 44                          III. CONCLUSION

¶ 45     For the reasons stated, we affirm the trial court's judgment.

¶ 46     Affirmed.